CHARLES EDWARD HAWKINS, Plaintiff in Error,
v. STATE OF TENNESSEE, Defendant in Error.
—469 S.W.2d 515.

March 23, 1971.

Certiorari Denied by Supreme Court June 7, 1971.

Robert L. White, Memphis, for plaintiff in error.

David M. Pack, Attorney General, Robert H. Roberts, Assistant Attorney General, Nashville, Sam J. Catanzaro, Jr., Assistant District Attorney General, Memphis, for defendant in error.

OLIVER, J. Charles Edward Hawkins, the defendant below, represented by retained counsel, was convicted of armed robbery in the Criminal Court of Shelby County and was sentenced to imprisonment for 10 years in the State Penitentiary. He is now before this Court upon his appeal in the nature of a writ of error duly perfected.

Jointly indicted with the defendant were Don Franklin Henry and Kenneth Bernard Morris. Those two codefendants were granted a severance.

By his first two Assignments of Error here, as in his amended motion for a new trial, the defendant charges the trial court with error in admitting into evidence the testimony of Memphis Police Officers Burkhalter and Carlisle pertaining to blood stains found in and upon the defendant's red Mustang automobile. The obvious and insuperable difficulty confronting the defendant in this contention is that there was no defense objection whatever to the testimony of the two officers. No principle of law is more firmly established than that when no objection to offered testimony or evidence is interposed, it may properly be considered and given its natural probative effect as if it were in law admissible. This Court will not consider an Assignment of Error

based on the admission or exclusion of evidence unless timely objection and exception was made in the trial court so as to give that court opportunity to make correction. Hancock v. State, Tenn.Cr.App., 430 S.W.2d 892.

Unquestionably, the rule requiring contemporaneous objection to the introduction of illegal evidence clearly serves a legitimate state interest. Prompt objection apprises the trial judge of the basis therefor, and gives the court the opportunity to conduct the trial without using the tainted evidence. If the objection is well taken, the evidence is excluded from the consideration of the jury, thus avoiding possible reversal and a new trial and greatly promoting and contributing to the orderly conduct of litigation. Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408.

Moreover, as noted hereinafter, the defendant testified about the blood on his car.

██ As in his new trial motion, in his last three Assignments of Error the defendant challenges the sufficiency of the evidence to warrant and support the verdict of the jury, specifically claiming in his last Assignment that there was no evidence to corroborate the testimony of the alleged accomplices, Donald Franklin Henry and Kenneth Bernard Morris. In reviewing the evidence under these Assignments of Error, we are bound by the rule, stated and restated over and over by our Supreme Court and this Court, that a jury's verdict of guilt, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in the evidence in favor of and establishes the State's theory of

the case. Under such a verdict, the presumption of innocence, which the law accords an accused prior to conviction, disappears and is replaced by a presumption of guilt which puts upon him the burden of showing upon appeal that the evidence preponderates against the verdict and in favor of his innocence. We may review the evidence only to determine whether it preponderates against the verdict and, in doing so, we must take the verdict as having established the credibility of the State's witnesses. The verdict will be disturbed on the facts only if the evidence clearly preponderates against it and in favor of the innocence of the accused. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Cr.App., 425 S.W.2d 799; Brown v. State, Tenn.Cr.App., 441 S.W.2d 485.

The rule that the credibility of the witnesses and conflicts in the testimony are all settled by the verdict of the jury, ''makes unnecessary and, indeed, inappropriate, a detailed discussion of that evidence, pro and con, * * * in stating what we conclude the material facts to be as established by that testimony.'' Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

In a program of extra-surveillance of business establishments regarded as being peculiarly attractive to robbers, following a rash of such incidents, the Memphis Police Department stationed two policemen in Walter J. Phelan's Minit-Stop grocery store in Memphis on the night of July 7, 1967. The officers concealed themselves in the rear of the store. Between 10:30 and 11:00 o'clock,

two young Negro men entered the store. One of them remained near the front. The other man went further into the store, approached the cash register through a checkout aisle while Mr. Phelan had the register open concluding a transaction with a customer, and then pulled a .22 caliber revolver and ordered Phelan to leave the register open—threatening to kill him if he moved—and took $325 in currency and four checks totaling $76. In response to this robber's inquiry, Phelan told him that the safe was in the rear of the store. With the gun at his back, both robbers began escorting him in that direction. Knowing that the officers would intervene momentarily, Phelan dropped to the floor as they approached the officers' hiding place. When one of the officers raised up and challenged them, the robbers fled, one of them running through the front glass door and the other following. The .22 caliber Harrington and Richardson revolver was dropped just outside the door. Glued to it was a short strip of stencil tape bearing the impressed letters HAW. It was admitted in evidence.

Dripping blood marked the path of the robbers' successful flight for some distance. After the bandits made good their escape, one of the officers saw a red Mustang automobile in the street nearby and questioned the driver briefly but did not detain him. Shortly before the robbery an employee of a funeral home located across the street observed a red Mustang in noticeable maneuvers in an adjoining side street—it paused, backed up into the funeral home parking lot where its lights were turned off briefly and then moved on and returned to the same area about the time the robbers ran from the store.

Police Officers Burkhalter and Paris, having arrived at the scene to assist in the investigation, after following the blood stains as far as possible, came upon a red Mustang automobile occupied by the defendant and parked near the Lester High School grounds. As they approached he turned his lights on and off and started and stopped a couple of times. Having information that a red Mustang had been seen in the vicinity of the robbery, the officers stopped the car and asked the defendant what he was doing in the neighborhood. He replied that earlier in the evening he and his girl friend had been swinging on the swings on the high school grounds, and that he had taken her home and was enroute to his home and had stopped there to answer a call of nature. On the Mustang's right door handle was fresh blood—"so fresh that it was dripping," and a few blood spots were seen on the inside of the car door. The officers arrested the defendant, advised him fully concerning his constitutional rights in keeping with the mandate of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and took him to police headquarters. He made no statements except that he wanted to confer with his attorney.

On July 11th, acting on a tip, two police officers went to a vacant house in the 1500 block of Hugenot Street in Memphis, located only a few doors from the defendant's home, where they found bloody clothing and four checks later identified by Mr. Phelan (and admitted in evidence) as having been taken in the robbery. No defense objection was interposed to admission of the revolver or the checks.

The co-defendants Henry and Morris testified as witnesses for the State. They testified that the defendant

planned the robbery, gave Morris his .22 caliber revolver, and parked his red Mustang automobile nearby to wait for them, and that they went to the Minit-Stop Grocery store and robbed it; that they fled when they encountered the police officers as they were escorting Phelan to the safe in the rear of the store and Morris ran through the front glass door and Henry followed him; that when they got back to where they had left the defendant he was gone; that when they later hailed him as they saw him driving on another street he had a girl in the car who became frightened when she saw Morris bleeding; that the defendant then left to take the girl home, promising to come back for them, and returned shortly thereafter and parked near the high school playground; that when they came out of hiding and Morris opened the defendant's car door and they started to get in, they saw a police car approaching and hid again and watched the officers talk to the defendant and take him away; that they then went to an abandoned house on Hugenot Street not far from the defendant's home and changed clothes and divided the money and spent the night; and that after about two days in South Memphis they went to Chicago. Both identified the defendant's revolver. They testified they had seen the defendant with it on other occasions.

Henry also testified that early in the evening he asked the defendant to take him to "my girl friend's house"; that when the defendant came by for him Morris was in the car and Henry's mother objected to his going; that the defendant later returned alone for him and they then picked up Morris; and that when they passed the Minit-Stop grocery the defendant said, "We could take the

money and all"; and that they circled the store once before the car was parked and he and Morris proceeded with the robbery.

Morris testified further that the defendant told him about his plan for the robbery before he picked him up that evening, and said that Henry was going to help; that when Henry did not accompany them when they first went to his house, the defendant took him (Morris) to the Golden Sundry to wait until he went back to get Henry; and that while they waited outside the Minit-Stop for the customers to leave, the defendant drove up and down the street three or four times.

The defendant testified that in the evening of July 7, 1967 Don Franklin Henry called his mother and "wanted me to take him over to his girl's house"; that when he got home and received that message he took his father's 1966 red Mustang automobile and went to Henry's house and picked him up, but he changed his mind about going to his girl friend's house and got out of the car at Hamilton Street and Park Avenue after they had driven around awhile, explaining that some other girls who had a Mustang were going to pick him up; that he then returned to his own home and ate and stayed there until about 9:00 or 9:15 and then went to visit his girl, Shirley Jean Gray; that on his way he drove by the Minit-Stop grocery but did not stop and turned around at the funeral home to take a short cut and a police officer came running out of the store with a shotgun and stopped him and questioned him briefly—"he scared the hell outa me" and then permitted him to proceed; that later in the night while he and Shirley were driving around Henry suddenly

jumped out into the street in front of his car and Morris, who was bleeding, grabbed the car door and repeatedly said he was in trouble and begged the defendant to help him get away from there, and that when he declined to do so Morris continued to hang onto the car insisting that he was going to get in anyway; that he drove on off and took Shirley home and remained there about 15 or 20 minutes while she played records; that on his way home he had stopped to answer a call of nature when a police car drove up and stopped; that when the officers called attention to the blood on the side of his car door and inquired about it he replied, "I said 'I'm not involved in anything, and don't want to get involved in anything, and its none of my business' "; and that they arrested him and took him to the police station. He denied having anything to do with the robbery in any way, denied that Morris was ever in his car that night, denied that he ever owned a gun of any kind or had one in the car, examined the revolver admitted in evidence and claimed that he could not see the letters HAW on it, denied that he made two trips to Henry's house that night, and denied that he told the police officers who arrested him that he and his girl friend had been swinging on the school playground swings. When asked why she was not there to testify, the defendant said: "She's not up here to testify, this mess has been going on so long that she got sick and tired of it. She told her story over and over again, and wouldn't nobody believe her," and then later testified that the last he heard of her she was in California and that he had recently made unsuccessful efforts to contact her.

The defendant's mother generally corroborated him concerning the time of his arrival at home and his departure to visit his girl friend on the night in question. She said that she had no conversation with Henry when he called about 5:00 p. m. and asked to speak to the defendant.

Considering the evidence in the light of the above-stated established rules governing appellate review in criminal cases, by which we are bound, the defendant has unquestionably failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

█ Nor is there any merit in the defendant's contention that the testimony of the accomplices Henry and Morris was uncorroborated. The funeral home employee saw a red Mustang automobile maneuvering strangely on the adjoining side street just before the robbery, and one of the policemen concealed in the store found that automobile nearby immediately after the robbery. Indeed, the defendant identified himself as the driver of that red Mustang, admitting that he drove by the Minit-Stop grocery and turned around at the funeral home and that the police officer stopped him and quizzed him and allowed him to proceed. He admitted that the accomplices Henry and Morris stopped him and tried to get him to take them away in his automobile, that Morris was bleeding, and that he knew about the resulting blood on the side of his car door, and that when the arresting officers inquired about it he told them that he was not involved in anything and didn't want to get involved in anything and "it's none of my business." He did not bother to tell

those officers that the blood resulted from his encounter with Henry and Morris.

The Supreme Court of this State and this Court have addressed themselves repeatedly to the question of the character and quality and quantum of evidence necessary to constitute legally sufficient corroboration of an accomplice. The rule, simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460; Boulton v. State, 214 Tenn. 94, 377 S.W.2d 936. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence be slight and entitled, when standing alone, to but little consideration. Stanley v. State, 189 Tenn. 110, 222 S.W.2d 384; Binkley v. State, Tenn.Cr.App., 434 S.W.2d 336.

"The entire conduct of the accused may be looked to for the corroborating circumstances; and if, from those

circumstances, the crime may fairly be inferred, the corroboration is sufficient. See 23 C.JS. Criminal Law sec. 812(4)." Binkley v. State, *supra*.

■ The quantum of evidence sufficient to corroborate the testimony of an accomplice is for the determination of the jury. From the facts proved in evidence the jury is entitled to draw reasonable inferences, and this Court may not substitute its judgment or inferences for those of the jury. Stanley v. State, *supra*; Binkley v. State, *supra*.

See also Williams v. State, 216 Tenn. 89, 390 S.W.2d 234; Campbell v. State, Tenn.Cr.App., 447 S.W.2d 877.

The judgment of the trial court is affirmed.

Galbreath and Mitchell, JJ., concur.