IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 9, 2002

## STATE OF TENNESSEE v. WILSON NEELY

**Appeal from the Criminal Court for Shelby County**
**No. 98-10092    Chris Craft, Judge**

---

**No. W2001-01327-CCA-R3-CD - Filed August 23, 2002**

---

Convicted at a jury trial of first-degree, premeditated murder and presently serving a life sentence, Wilson Neely appeals from the Shelby County Criminal Court. He claims that his conviction is improperly based upon uncorroborated and insufficient testimony of accomplices. Because we disagree, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Marvin E. Ballin, Memphis, Tennessee, for the Appellant, Wilson Neely.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

This case arises from the shooting of Billy Ray Brown. It appears from the record that the intended target of the crime was Bertram Johnson; however, Mr. Brown became the unintended victim. The issue presented in this case pertains to accomplice testimony. Thus, it is essential to understand which components of the state's case were provided by the various witnesses.

Karen Seymour, who by all accounts was not involved in the crime in question, testified that on the evening of October 29, 1997, she visited Bertram Johnson at a "dope house" at 1010 Cella Street in Memphis. Although Mr. Johnson did not reside at 1010 Cella, he spent time there. Mr. Johnson is the father of Ms. Seymour's daughter. Mr. Johnson became upset that Ms. Seymour was accompanied by a male friend. Mr. Johnson became verbally abusive and took $50 from her. When she demanded that he return the money, he refused and brandished a weapon.

Ms. Seymour went to the home she shared with her mother and her brother, Robert Seymour. She told her brother, who was a member of the Gangster Disciples, what had happened. During the evening, other members of the Gangster Disciples arrived at the Seymour residence. Ms. Seymour identified these individuals as Albert Wilson, Ira Farris, Kevin Porter, and the defendant Wilson Neely. These gentlemen all left together, and Robert Seymour returned 30 minutes to an hour later.

Kevin Porter, who denied any affiliation with the Gangster Disciples, testified that he, Albert Wilson, and Ira Farris went to the Seymour residence on the date in question. Karen Seymour, Robert Seymour, Brian Bison, and the defendant Wilson Neely were also present that evening. Porter claimed that he was in the back room with Karen Seymour most of the time. However, he was aware that there was a conversation going on in the living room among Robert Wilson, Ira Farris, Brian Bison and the defendant. Porter went into the living room from time to time and heard bits of the conversation. According to Porter, Robert Seymour said that he needed to "ride on this n----- and see what's up." Porter was present when the defendant was involved in telephone conversations in which the defendant was attempting to locate Bertram Johnson.

Porter claimed that as the group of men left the Seymour home, he believed they were going to a nightclub. Porter, Al Wilson, Robert Seymour and Ira Farris rode in Porter's Pontiac Parisienne, and the defendant, Brian Bison and an individual whom Porter did not know were in a small, green car. During the ride, one of the passengers in Porter's vehicle suggested that they go to Cella Street. Porter testified that he thought the purpose of going to Cella Street was to get some "weed." As they were approaching Cella Street, Porter heard a click and looked into the back seat. He saw that Robert Seymour had a Tec 9 or Uzi firearm. He then noticed that Ira Farris had a small, nine millimeter weapon, and Al Wilson had a laser-site Beretta. Porter claimed that he had not seen any weapons prior to this point in the evening. Porter testified that he thought his passengers, whom he claimed not to know well, might be about to carjack him. He claimed to have inquired what was going on, but one of the passengers told him it was "nothing" and to continue on his course.

According to Porter, the defendant was already parked on Cella Street as he approached. The defendant was out of his vehicle and in the yard of 1010 Cella. As Porter started to pull over, the defendant gave some type of hand signal, and Albert Wilson jumped out of Porter's car before it was fully stopped. Gunfire erupted. Farris and Seymour exited Porter's car, and Porter claimed that he ducked down into the seat. Porter claimed that he was afraid to drive away because he knew that if he fled, he would have to face the other men later and justify having left them. Porter heard at least 25 shots, a pause, and then five or six more shots. He heard someone yell, "Hold up, man. Damn, what's up Wilson?" Porter looked into his rear-view mirror, and about twenty feet away, he saw the victim's legs extending from behind the small, green car. Porter testified that the defendant walked to the victim, who was on the ground, and stood over him. With a larger handgun,

the defendant shot the victim five or six times.[1] The occupants of both cars then fled in the vehicles in which they had arrived. Porter maintained that he was afraid he would be shot, so he drove away. As they neared an intersection on Cella, the police began following them. Porter claimed to be concerned that his passengers would begin shooting at the police. He fled for short distance, hit a tree, and fled on foot. He claimed that he intentionally hit the tree because he was flustered and was concerned that he would be killed in the course of a chase. Porter hid in some bushes, and he was apprehended shortly thereafter.

At trial, Porter acknowledged that he had given an initial statement in which he was not entirely forthcoming. He explained that he was afraid of retaliation. Later, however, he gave a more detailed statement. Porter maintained at trial that he had no advance knowledge that the purpose of going to Cella Street was to cause harm to anyone. He also maintained that he did not have a weapon with him and that he did not fire a weapon during the shooting. At the time of the defendant's trial, Porter was under indictment for facilitation of first-degree murder. He denied that he had any sort of plea bargain arrangement with the state in exchange for his testimony.

Travis Sugars testified that he was present at 1010 Cella and saw Karen Seymour and Bertram Johnson talking. Later that same evening, Sugars was present when Robert Seymour came to 1010 Cella to leave a threat for Bertram Johnson. Although Johnson was not present at the time, he returned after Mr. Seymour departed. Sugars observed Johnson receive a call on his cellular telephone and become involved in an argument.

Ira Farris testified that like the defendant, he is under indictment for first-degree murder relative to the shooting. For the most part, his testimony was consistent with that given by Kevin Porter. It differed, however, in certain significant respects.

Farris identified himself, Porter, the defendant, Brian Bison, Robert Walker, Albert Wilson, Robert Seymour, and an individual named Andre as additional members of the Gangster Disciples. He admitted that there was a conversation about the earlier incident between Karen Seymour and Bertram Johnson and that it was decided that the group needed to straighten the matter out. He specifically identified the defendant as being present during this conversation. Contrary to Porter's testimony, Farris said that Bison was not present for the conversation, although he said that Bison joined the group outside the Seymour residence and traveled with them to Cella Street. Farris testified that none of this conversation specifically pertained to killing or using weapons. Farris identified Robert Walker and Andre as being present later in the evening at the Seymour residence.

Farris described the criminal episode much as had Porter, and he provided additional details. He recalled seeing the defendant in a heated conversation with Bertram Johnson before the shooting began. Farris did not see Johnson with a gun, although he thought from Johnson's movements that he had a gun. According to Farris, there were about six people on the lawn of 1010

---

[1]There is no evidence that the defendant and his associates had any grievance with, or even knew, the victim. It appears that the victim was, unfortunately, in the wrong place at the wrong time.

-3-

Cella, all of whom "hit the ground" when the shots began. Farris contradicted Porter's testimony that gunfire began immediately as they arrived. After most of the shooting was over, Farris saw the defendant backing up. The defendant and the victim bumped into each other; the defendant turned around and fired more shots. The victim fell to the ground almost immediately.

Law enforcement witnesses provided additional evidence. A Memphis Police Department officer testified about various weaponry and other physical evidence found at the scene. An agent from the Tennessee Bureau of Investigation testified as an expert in firearms identification. She identified the weapons and ammunition recovered from the scene and identified the weapons from which certain items of ammunition had been fired. Additionally, she testified that gunshot residue samples taken from Kevin Porter and Travis Sugars were inconclusive, while the sample from Andre Jackson was negative and from Ira Farris was positive.[2]

The county's assistant medical examiner testified about the autopsy she performed on the victim. She identified the gunshot wounds he sustained, and she opined that he was shot from more than two feet due to the absence of stippling from gunpowder. Further, she testified that fragments of asphalt found in a ground wound were consistent with the victim having been shot as he was lying on the ground.

The jury found the defendant guilty of first-degree murder, and this appeal followed.

Now, the defendant raises two appellate issues. First, he challenges the trial court's ruling that the question whether Kevin Porter was an accomplice was one of fact to be resolved by the jury, rather than a question of law for the court's determination. Second, he claims that the accomplice testimony was insufficiently corroborated.

In Tennessee, a conviction may not be based upon the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). "Where there is testimony of multiple accomplices, there must still be corroboration since accomplices cannot corroborate each other." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). An accomplice is an individual who knowingly, voluntarily and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the facts are undisputed regarding a witness's participation in the crime, whether he is an accomplice is a question of law for the trial court. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). However, when the facts are disputed or susceptible to different inferences, it is a question for the jury. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). The jury determines whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971). The general rule is that

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has

[2] Agent Arney did not perform the gunshot residue analysis. However, she was permitted to testify about the results via stipulation of the parties due to the testing agent's unavailability.

been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence be slight and entitled, when standing alone, to but little consideration.

*Hawkins v. State*, 4 Tenn. Crim. App. 121, 133, 469 S.W.2d 515, 520 (1971) (citations omitted).

There can be no real question that Kevin Porter is potentially an accomplice. Thus, the first question before us is whether Kevin Porter is an accomplice as a matter of law. Like the trial court, we hold that he is not. Taken in the light most favorable to the state, Porter testified that he was not a Gangster Disciple and did not know well his companions on the evening of October 29, 1997. He claimed to have believed that he and his companions were going to a nightclub when they left the Seymour residence. He further claimed to have believed that while en route, they were going to Cella Street to obtain marijuana, and when he saw weapons as they turned onto Cella Street, that he was fearful he was being carjacked. He portrayed himself as a victim who cowered in his car as his companions opened fire at 1010 Cella. Further, he claimed that he fled the scene with his three passengers out of fear, and this fear also caused him to wreck his car in order to end the police chase. However incredible some aspects of Porter's testimony may seem if other, conflicting evidence is accredited, one possible inference that may be drawn from it is that Porter was an unknowing actor when he drove his companions to Cella Street and that he was compelled by fear to flee the scene after his companions' crime. Thus, the question of his status as an accomplice is one of fact. The trial court did not err in submitting the issue of Porter's accomplice status to the jury. *Cf. State v. Pressley Calvin Farley*, No. 22 (Tenn. Crim. App., Knoxville, Sept. 10, 1990) (order on petition to rehear) (it does not matter whether trial court instructed jury that witness was an accomplice as a matter of law or submitted accomplice status as a factual matter for jury to determine where testimony of witness is sufficiently corroborated to sustain the conviction).

The next question raised by the defense – whether Porter's and Farris' testimony was adequately corroborated – presupposes that Porter was an accomplice. We choose to view this question through the more general inquiry of sufficiency of the evidence, with the corroboration issues in mind. *See State v. Williford*, 824 S.W.2d 553, 554 (Tenn. Crim. App. 1991) (question of sufficiency of accomplice corroboration is one of sufficiency of the evidence).

When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id.* at 835. In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id.* at 914.

It is impossible for us to know whether the jury accredited Porter's testimony relative to his lack of culpability for the crime and found that he was not an accomplice or whether it determined that he was an accomplice but that his testimony was adequately corroborated. However, the records supports a sufficient evidence finding in either case.

If the jury found that Porter was not an accomplice, Porter's testimony viewed both in its own right and as corroborative testimony of Ira Farris supports a conclusion that the defendant and his Gangster Disciple associates planned the murder of Bertram Johnson in retaliation for Johnson's actions toward Karen Seymour, although in the course of executing the murder, the defendant killed Billy Ray Brown.

On the other hand, if the jury found that Porter was an accomplice to the defendant's murder of Billy Ray Brown, there is adequate corroborative evidence to sustain the conviction. Both Farris and Porter gave eyewitness testimony that the defendant was the individual who shot Brown. Thus, if their testimony is corroborated in some respect, it will provide sufficient identification evidence to support the defendant's conviction. In that regard, Karen Seymour testified about a disagreement she had with Bertram Johnson on the night in question. She recalled having discussed this with her brother, Robert Seymour. Karen Seymour also testified that several of her brother's associates, including the defendant, congregated at her house on the evening of the crime. Farris

testified that the disagreement between Karen Seymour and Johnson was a topic of discussion at the Seymour residence, that a decision was made to go to Cella Street to "straighten it out," and that the defendant was present during this discussion. According to Karen Seymour, Farris, and Porter, the men left in two vehicles following the discussions. All three witnesses described the vehicles similarly. Physical evidence corroborated the testimony given by Porter and Farris. Both testified that Albert Wilson had a nine millimeter Beretta handgun, and this type of weapon was recovered from the front seat of Porter's wrecked car where Albert Wilson had been seated. Expert testimony established that several of the shell casings recovered from the scene had been fired from the Beretta. Porter testified that Robert Seymour had a weapon inside a purple Crown Royal liquor bag, and a bag of this type was recovered at the scene. Other expert testimony established that the victim was shot while lying down, which is consistent with the eyewitness accounts of the shooting.

This evidence meets the quantum necessary to corroborate the testimony of Porter and Farris. Having been corroborated, Porter's and Farris' testimony may be considered in evaluating the sufficiency of the evidence. As stated above, the testimony of these two witnesses along with the balance of the state's evidence sufficiently supports the jury's finding that Wilson Neely and his associates committed the premeditated murder of Billy Ray Brown. The evidence "fairly and legitimately tends to connect the defendant with the commission of the crime," *Hawkins*, 4 Tenn. Crim. App. at 133, 469 S.W.2d at 520, and evidence independent of Porter's and Farris' testimony establishes the defendant's identity as one of the group of men who discussed retaliation against Bertram Johnson and then engaged in the criminal episode which culminated in the killing of Billy Ray Brown. *See id.* at 133, 469 S.W.2d at 520.

Thus, we affirm the defendant's first-degree murder conviction.

_____
JAMES CURWOOD WITT, JR., JUDGE