IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 10, 2010

**STATE OF TENNESSEE v. KIMBERLY MANGRUM**

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR7087A      George Sexton, Judge**

_____

**No. M2009-01810-CCA-R3-CD - Filed November 9, 2011**

_____

Defendant, Kimberly Mangrum, was indicted by the Dickson County Grand Jury for especially aggravated burglary, especially aggravated kidnapping, first degree premeditated murder, felony murder, and four counts of criminal conspiracy, related to the commission of each of those offenses. Following a jury trial, Defendant was convicted of aggravated burglary, especially aggravated kidnapping, attempted first degree premeditated murder, and felony murder. Her conviction for attempted first degree premeditated murder was merged into her felony murder conviction, and she was sentenced to life imprisonment for her first degree felony murder conviction, twenty-five years for especially aggravated kidnapping, and six years for aggravated burglary, with the sentences to be served concurrently. In this direct appeal, Defendant challenges the sufficiency of the convicting evidence and asserts that the trial court erred by not dismissing the indictment following what, Defendant contends, was the State's misuse of the grand jury proceedings. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

William Bradley "Jake" Lockert, III, District Public Defender; and Christopher L. Young, Assistant District Public Defender, for the appellant, Kimberly Mangrum.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paducah Stempel, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Suzanne M. Lockert, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

The victim in this case, LeeAnn Mangrum, was the ex-wife of Defendant's husband and co-defendant Terry Mangrum, Sr. The victim and Mr. Mangrum had two children of their marriage, Terry Mangrum, II, and A.M. (who will be referred to by her initials in this opinion because of her age). The children had previously lived with the victim but had been removed from her custody by the Department of Children's Services and placed in the home of Defendant and their father. Due to the similarity of their names, Terry Mangrum, Sr. will be referred to as "Mr. Mangrum," and Terry Mangrum, II as "Terry."

Terry, also charged with the murder of his mother, (he was transferred from juvenile court to be tried as an adult) was 17 years old at the time of Defendant's trial. He testified that Defendant had a history of being violent and making threats toward both the victim and himself. He had seen Defendant curse and call the victim names and threaten her with violence. Defendant also paddled Terry with a wooden board if he did not obey her, and on one occasion, Defendant burned him with her cigarette. Defendant had ordered him not to speak to his mother. He was afraid of Defendant. Terry testified that he was offered the opportunity to plead guilty to a reduced charge of second degree murder for his testimony that he acted under duress by Defendant.

On September 7, 2002, the victim met some friends at a local bar to watch a football game. She left the bar between 11:30 p.m. and midnight. That same night, she called her mother, Betty Wade, from a friend's cell phone between 9:00 and 9:30 p.m. and made arrangements to meet her at church the next morning. Ms. Wade testified that she received a phone call from the victim's cell phone at 5:20 a.m. the following morning, and an unfamiliar voice that was not her daughter's said, "Mama, please help me. I'm scared." Ms. Wade contacted the victim's neighbor, Agnes Sullivan. Ms. Sullivan testified that the victim's vehicle was not at home. The following afternoon, Ms. Sullivan went inside the victim's home, using a spare key that she had, and found the home in disarray. She testified the home looked "ransacked."

In the early morning hours of September 8, 2002, Defendant woke up Terry and told him to go with her. He and his sister, A.M., got into Defendant's car, and Defendant began driving around. She drove by the victim's trailer, but the victim was not there. As they were driving away, they passed the victim in her Jeep, and Defendant turned around and followed the victim home. Defendant grabbed a baseball bat from behind her seat and began beating the victim's vehicle with it. Defendant yelled at Terry and A.M. to get out of the car. The victim tried to drive away, and Defendant burst the passenger side window with the bat.

-2-

Defendant then broke the driver side window and pulled the victim out of her vehicle by her hair. Defendant punched the victim in the face and beat her with the baseball bat until she was unconscious. She then found a piece of wood and ordered Terry to hit her with it. He testified that he did not want to hit his mother with the wood, but Defendant "made [him] hit her." Defendant told A.M. to get some rope out of her car and told Terry to help tie up the victim. She threatened Terry that if he did not follow her orders he would end up in the "same situation." While the victim was still unconscious, Defendant and Terry tied the victim's hands behind her back and put her in the backseat of her Jeep. Defendant then told Terry to drive his mother's Jeep and follow her in her Mustang. They drove down a rocky, dirt road and parked beside a creek. Terry and Defendant pulled the victim out of the car and laid her beside the water. Defendant told A.M. to get Defendant's medications from her car. Defendant and Terry shoved pills down the victim's throat and pushed her into the water. Defendant threatened to kill Terry if he did not put his foot on the victim and hold her underwater to make sure she was dead. Defendant then drove the victim's Jeep into the water.

Defendant, Terry, and A.M. left in Defendant's Mustang. Defendant told Terry to throw his shirt, the rope, and a cell phone out of the window as they drove away. Defendant drove back to the victim's trailer because she had left the baseball bat there. On the way there, she told Terry and A.M. "over and over" to "keep their mouths shut [and] it would be okay and . . . all blow over and nobody [would] ever know about it." When they arrived at the victim's trailer, Defendant stated that they were going to go inside to see if the victim had any money. Defendant gave Terry a screwdriver from her car and told him to pry open the door, but he could not pry it open, so she told him to break the window with the screwdriver. Terry broke the window and lifted A.M. through the window in order to let Defendant inside the trailer. Once inside, Defendant broke things and knocked over things inside the victim's home. Defendant and A.M. filled four trash bags with the victim's clothes and jewelry and left the victim's residence.

The following day, Terry and A.M. washed Defendant's Mustang, and Defendant concocted a story for them to tell the authorities. Sometime later, Defendant learned of a search warrant to obtain Defendant's DNA, and Defendant took Terry and A.M. to live in North Carolina. After they returned to Tennessee one month later, the police obtained DNA samples from Defendant and Terry pursuant to a search warrant. Defendant became increasingly paranoid and "made" Terry write a statement admitting that he had killed his mother. Terry testified that Defendant stuck him in the side with a knife while he wrote the statement. On another occasion, Terry missed the school bus, and Defendant sat on him while cutting his neck with a coat hanger.

A fisherman found the victim's body and her partially submerged Jeep in Turnbull Creek on the afternoon of September 8, 2002. Police were called to investigate. The victim's injuries included multiple blunt force traumas to the head and contusions on the abdomen, torso, and buttocks. Her injuries were consistent with being hit with a baseball bat. She died from drowning. Defendant's DNA was found on a recently deposited cigarette butt found outside the victim's home. A drop of blood found on a window at the victim's home matched Terry's DNA, and his fingerprints and A.M.'s palm print matched latent prints taken from a broken piece of window pane. Latent prints were also taken from the victim's Jeep, but none of the prints were identified as belonging to either Defendant, the victim, or Terry. A.M. testified that Defendant made them wear gloves during the incident.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the convicting evidence. Specifically, Defendant asserts that there was insufficient evidence of premeditation. The State responds that Defendant's conviction was for felony murder in the perpetration of a kidnapping, rather than first degree premeditated murder. The record shows that Defendant was convicted of felony murder and attempted first degree premeditated murder, and the trial court appropriately merged her conviction for attempted first degree premeditated murder into her conviction for felony murder. Therefore, the State is correct in that evidence of premeditation is not necessary in order to sustain Defendant's conviction.

Although Defendant does not specifically challenge her convictions for felony murder or especially aggravated kidnapping, we conclude that the evidence was sufficient to sustain both convictions. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences drawn therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2).

"Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302, [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305. False imprisonment is the knowing removal or confinement of "another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302.

Viewed in the light most favorable to the State, the record shows that Defendant beat the victim unconscious by repeatedly hitting the victim with a baseball bat and a piece of wood. As a result of the beating, the victim suffered blunt force trauma to the head, bleeding in the skull, and multiple skin contusions. Defendant and Terry tied the victim up with rope, and Defendant ordered Terry to assist her in putting the unconscious victim in the Jeep. Terry then drove the victim's Jeep and followed Defendant to a creek where he and Defendant placed the victim in the water and she drowned. Accordingly, the evidence is sufficient to support Defendant's conviction.

Defendant only briefly addresses, without any citation to authority, the issue of whether there was sufficient evidence to corroborate the testimony of Terry and A.M., who were accomplices. She argues that the only corroborating evidence is Defendant's DNA on a cigarette butt found in the victim's yard. In its brief, the State fails to respond to the issue.

It is well settled in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). This "very salutary rule" is designed to prevent the "obvious dangers" of allowing a defendant to be convicted solely on the basis of an accomplice's testimony. *Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 814 (Tenn. 1959). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate the testimony of an accomplice. *State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). With respect to the nature, quality, and sufficiency of the evidence necessary to corroborate an accomplice's testimony, this Court has held as follows:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.
>
> . . . .

The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplices testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

*State v. Griffis*, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (citations omitted).

The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. *Boxley*, 76 S.W.3d at 387. It is generally for the trier of fact to determine whether sufficient corroboration exists. *Id*. (citing *Shaw*, 37 S.W.3d at 903). Where there are multiple accomplices there must be additional corroboration, since accomplices cannot corroborate each other. *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995) (citing *Bethany v. State*, 565 S.W.2d 900 (Tenn. Crim. App. 1978)).

In this appeal, neither party identifies as an issue whether A.M., the victim's minor daughter who was not charged, is actually an accomplice. If it were determined that she was not an accomplice, her testimony need not be corroborated. This Court has previously held:

An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime. *Conner v. State*, 531 S.W.2d 119 (Tenn. Crim. App. 1975). The test is whether or not the alleged accomplice can be indicted for the offense. If, however, the witnesses' participation in the crime is the result of force, coercion, duress, or undue influence so that the participant does not act voluntarily, with the same intent as the principal, then the witness is not an accomplice." *Henley v. State*, 489 S.W.2d 53 (Tenn. Crim. App. 1972).

*Green*, 915 S.W.2d at 831.

The question of whether a participant is an accomplice or whether the participant acted under duress is a question of fact for the jury's determination. *Id*. at 831-32 (citations omitted). There is nothing in the record before us to indicate that the jury considered whether A.M. was an accomplice. The record shows that she was granted immunity by the State and therefore was not charged with any offense. The trial court's jury instructions, however, are not included in the record. Therefore, we cannot determine whether the jury was instructed that accomplice testimony must be sufficiently corroborated. We believe that the facts in this case sufficiently raise the question of whether A.M. was an accomplice. Had the jury concluded that A.M. was not an accomplice, it could have given her testimony the same weight as any other witness without the requirement of corroboration. *Id*.

Nevertheless, after carefully considering the proof in the record before us, we conclude that the accomplices' testimony was sufficiently corroborated. Defendant's DNA was on a cigarette butt found in the victim's yard. TBI Agent Joe Minor testified that he had been employed by the TBI Forensic Services Division for 21 years. Defendant stipulated as to Agent Minor's expertise. As a then DNA supervisor, he was the team leader in this case and went to the first crime scene, the victim's residence, to document and gather evidence to be tested. The cigarette butt was found beside a tree stump behind the victim's trailer. Agent Minor testified that, based on the condition of the cigarette butt, it had been there only 24 to 48 hours prior to having been recovered by investigators the day after the crimes occurred.

Evidence that Defendant's DNA was found on a "fresh" cigarette butt at the crime scene clearly establishes that Defendant was present at the victim's home during the time frame of the crimes. Further review of the evidence reveals that Defendant gave three separate interviews to investigators. In an interview on September 9, 2002, the day after the crimes, Defendant told Detective B.J. Gafford that the victim had been at Defendant's house in the early morning hours of September 8th. She was accompanied by a man named "Bob" with "salt and pepper" hair, who drove a Mustang vehicle, dark in color, that was two or three years newer than Defendant's Mustang, and had a Harley Davidson plate on the front, just like the Harley Davidson plate on Defendant's Mustang. Defendant told the detective that "Bob" looked "evil." She said she had given the victim a Klonopin, and she told the detective that she could not find her pill bottle and that the victim might have stuck it in the victim's purse. She also speculated that the victim might have driven home a "back way." In a subsequent interview on February 11, 2004, Defendant again stated that the "salt and pepper" haired man with the victim on the night she was murdered had driven a "car like [hers]" also with plates like hers. In that same interview, and in a subsequent interview on February 24, 2004, Defendant told TBI Agent Joe Craig that she had been to the victim's home approximately two weeks before she was murdered. Defendant also told Agent Craig, without being asked, "I was smoking that day. I'll go ahead and tell you that."

Defendant's statements to investigators, while certainly not sufficient alone to prove Defendant's guilt, do tend to connect Defendant with the commission of the offense because they show Defendant's guilty knowledge. The jury could reasonably infer that in Defendant's first statement to an investigator, she was concerned that a witness might have told law enforcement that a vehicle matching the description of Defendant's vehicle had been seen in the proximity of the victim's home or the location of where the victim's body was found. The jury could also infer that Defendant had misplaced her prescription pill bottle, and gave an explanation of why it might be found near the victim. Furthermore, the jury could infer that Defendant knew the location of where the victim's body was found and tried to give an exculpatory explanation to officers that the victim might have driven home a "back way." Finally, by the time of the second interview, Defendant was aware that a cigarette butt had been found and seized in the victim's yard. At this second interview, she gave an unsolicited comment that she had been smoking during a visit to the victim's home approximately two weeks before the homicide.

The corroborating evidence "need not be adequate, in and of itself, to support a conviction" and may be only "slight and entitled, when standing alone, to little consideration." *Green*, 915 S.W.2d at 831 (quoting *Hawkins v. State*, 4 Tenn. Crim. App. 121, 469 S.W.2d 515, 520 (1971). We conclude that Defendant's statements, taken together with the DNA evidence, sufficiently corroborate the accomplices' testimony. Defendant is not entitled to relief on this issue.

Defendant also asserts on appeal, as part of her argument as to the sufficiency of the evidence, that the trial court erred by not allowing her to use demonstrative evidence at trial in the form of a 177-pound dummy, the same height and weight of the victim, to demonstrate Defendant's ability, or inability, to lift and carry the unconscious victim. Defendant asserts that this evidence was relevant "in light of [the] State's proof in regard to [D]efendant's strength testified to by Ronald Durham." This is the totality of Defendant's argument on this issue. In her brief, Defendant then asserts that Mr. Durham's testimony was not relevant. Mr. Durham testified that he lived across the street from the Mangrums before and during the time of the incident and that he noticed a difference in how often he saw Terry and A.M. after Defendant married their father. He testified that prior to Defendant living there, he saw the children frequently with Mr. Mangrum, and afterwards, he saw them very infrequently and on those occasions it was always with Defendant. In a jury-out hearing, the trial court stated:

> Well, I'm going to allow the testimony. I don't see very much relevance to it; but part of it, apparently, the State's theory is that [Defendant] was controlling and she was able to control this family to the extent that she was

able to cause Little Terry to commit this murder. And it bears some relevance as to that issue.

. . . .

Again, it doesn't have a lot of relevance, but it's at least circumstantial evidence that the jury could infer that they were under her control.

The State responds that Defendant has waived these issues because she failed to cite any authority in support of her argument as required by Tennessee Rule of Appellate Procedure 27(a)(7) and Tennessee Court of Criminal Appeals Rule 10. We agree. Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint). Defendant fails to cite any authority for her claims. Therefore, Defendant is not entitled to relief.

*Grand Jury Process*

Defendant argues that the indictment should have been dismissed or A.M.'s testimony should have been suppressed during trial, pursuant to her pre-trial motion. Defendant contends that the prosecutor "misus[ed] the grand jury process to discover [A.M.'s] testimony and grant [A.M.] immunity." The crux of Defendant's argument, at trial and on appeal, is that the return of the presentment, the charging instrument in this case, removed all inquisitorial and investigative powers of the grand jury. Defendant argues that the grand jury could not be used for the purpose of obtaining additional inculpatory evidence against Defendant.

While there is no Tennessee case directly on point, "[i]t is universally recognized that it is improper to use the grand jury for the purpose of preparing [a case on] an already pending indictment for trial. The grand jury's role is to investigate possible criminal conduct in order to determine whether to return an indictment . . . [and] not . . . to conduct discovery in a pending criminal case." Sara Sun Beale et al, *Grand Jury Law and Practice* § 9:16 (2d ed.)(internal footnotes omitted) (citations omitted).

The courts have made it clear that the grand jury is entitled to continue to investigate the indicted defendant, if that investigation is for a purpose other than to discover evidence relating to the charges in the pending indictment. Such a legitimate purpose would include exploring the possibility of filing additional charges against the same defendant. It is equally clear that the grand jury can continue to investigate other persons who were not charged in the initial indictments. Finally, it is settled that if, in the course of such legitimate investigative efforts, the prosecution obtains evidence that is relevant to the pending case, it can use that evidence at trial.

*Id*.

The State argues that the filing of a superseding indictment, charging Defendant with additional charges, constitutes a legitimate purpose for further grand jury investigation. The decision whether to dismiss an indictment lies within the discretion of the trial court. *State v. Harris*, 33 S.W.3d 767, 769 (Tenn. 2000) (citing *State v. Benn*, 713 S.W.2d 308, 311 (Tenn. 1986)). Appellate courts "'may not interfere with a ruling made within the discretionary powers of the trial court absent clear abuse.'" *Harris*, 33 S.W.3d at 769-70 (quoting *State v. Street*, 768 S.W.2d 703, 709 (Tenn. Crim. App. 1988)). Furthermore, "[t]he power to seek a superseding indictment lies within the broad discretion of the State." *Harris*, 33 S.W.3d at 771. Our supreme court has held,

[w]here there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending. Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

*Id*. (internal footnotes omitted) (citations omitted).

The technical record shows that Defendant was indicted, by a presentment filed with the Court on February 23, 2004, for especially aggravated burglary, especially aggravated kidnapping, first degree premeditated murder, and first degree felony murder. A superseding indictment, charging Defendant, along with Terry Mangrum, Sr., with the same four counts as well as conspiracy to commit each of those offenses was also filed on February 23, 2004. We cannot discern from the record the exact date the grand jury proceeding in question was convened (wherein A.M. testified), but it is abundantly clear that it was **not** between the

filing of the first presentment at 9:55 a.m. on February 23, 2004, and the second presentment, filed at 4:10 p.m. on the same date. Based on the record before us, the State's argument must fail.

Defendant cites several cases, some applicable and some inapplicable, in support of her argument. Defendant cites *Matter of the Additional Grand Jury of Monroe County*, 130 Misc.2d 505, 507, 496 N.Y.S.2d 653, 655 (N.Y. Co. Ct. 1985) (A court may intervene in a grand jury proceeding "where fundamental fairness requires it or where abuse of authority is present."); *Parton v. State*, 455 S.W.2d 645 (Tenn. Crim. App. 1970) (An indictment based on hearsay testimony to the grand jury was improper, but the trial court did not err by refusing to dismiss the indictment because defendant's rights were not violated.); and *Bowling v. Sinnette*, 666 S.W.2d 743 (Ky. 1984) (It was proper for the trial court to strike portions of a grand jury report which "cast aspersions" on the subjects of the investigation where an indictment was not returned). Defendant also relies upon *United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir. 1992), in which the Sixth Circuit Court of Appeals held that "[a] court may not interfere with the grand jury's investigation 'so long as it is not the sole or dominant purpose of the grand jury to discover facts relating to [a defendant's] pending indictment.'" *Id*. (quoting *United States v. George*, 444 F.2d 310, 314 (6th Cir. 1971)). The *Breitkreutz* court also held, "[t]he defendant retains the burden of demonstrating that an abuse has occurred, as a 'presumption of regularity attaches to a grand jury's proceedings . . . .'" *Id*. (quoting *United States v. Woods*, 544 F.2d 242, 250 (6th Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S. Ct. 1652, 52 L. Ed. 2d 361 (1977)).

Here, Defendant filed motions to suppress A.M.'s testimony, to dismiss the indictment, and to quash the grand jury subpoena for A.M. In an order denying Defendant's motions to dismiss the indictment or suppress A.M.'s testimony, the court found that "[i]t appears . . . that A.M. was an unknown witness on the two previous occasions the grand jury met, so that it was appropriate to subpoena her back to a third grand jury to testify." In its order denying Defendant's motion to quash the subpoena of A.M., the trial court ruled that "although the main or predominant purpose of the subpoena is to seek additional inculpatory evidence against the defendant Kim Mangrum on the indicted charge of first degree murder, [ ] it is not the sole purpose. . . ." There is nothing in the record before us that indicates that the trial court erred in its ruling. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-11-