# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 19, 2003

## STATE OF TENNESSEE v. MICHAEL DAVID TOTTY

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR5870     Robert E. Burch, Judge**

---

**No. M2002-02601-CCA-R3-CD - Filed February 26, 2004**

---

Defendant, Michael David Totty, was indicted on one count of burglary of a building other than a habitation, a Class D felony, and one count of theft of property over $1,000 but less than $10,000, a Class D felony.  The jury found Defendant guilty of the lesser-included offense of facilitation of a burglary other than a habitation on count one and guilty on count two, theft of property.  The trial court sentenced Defendant as a Range III persistent offender to ten years on the theft conviction and six years on Defendant's conviction of facilitation of a burglary.  The trial court ordered Defendant's sentences to run concurrently for an effective sentence of ten years.  Defendant does not appeal his sentence.  On appeal, Defendant argues that the trial court's denial of his motion for a continuance prevented Defendant from securing a material witness for trial and denied his counsel an adequate opportunity to evaluate Defendant's competency to stand trial.  Defendant also argues that the evidence was insufficient to support his convictions.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Kenneth K. Crites, Centerville, Tennessee, for the appellant, Michael David Totty.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Kim Menke, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

Michael Harris is the owner of Harris Brothers Logging in Vanleer.  Mr. Harris spent the weekend of October 27, 2001 in Gallatin visiting his girlfriend, Janice Wilkins.  Ms. Wilkins' daughter, Amber, was also in Gallatin on Saturday and Sunday.  Mr. Harris returned to the shop in Vanleer on Monday morning, October 29.  The garage door was still locked, but when he entered

the building, Mr. Harris noticed that several tools and other items had been stolen over the weekend. Most of the items were later recovered and returned to Mr. Harris. A deer stand, a floor jack, a sledge hammer and two speakers were never found.

Mr. Harris said that he did not know Defendant prior to the incident and had never seen Defendant in the shop. He knew Defendant's co-defendant, Danny Wilkins, however, because Janice Wilkins was Mr. Wilkins' ex-wife. Danny Wilkins' daughter, Amber, had also lived at Mr. Harris' house a few months before the burglary. Mr. Wilkins had previously visited both Mr. Harris' home and the shop. As far as Mr. Harris knew, there was no animosity between the two men as a result of the relationship between Mr. Harris and Ms. Wilkins.

Mr. Harris said that the garage door leading into the shop could be unlocked easily if one were familiar with the door's latch. There was no sign of a forced entry into the shop. Mr. Harris said that none of the stolen items were insured, and he only had the serial numbers for the chainsaws. The value that Mr. Harris placed on the stolen items was based on his estimate of the replacement cost of each item.

Johnny Harris, Michael Harris' brother, said that he was at the shop on Saturday until midnight. When he left, Johnny Harris locked the garage door. Johnny Harris confirmed that the garage door could be unlocked by simply inserting something into the door and flipping the latch. He also said that he had never seen Defendant in the shop.

Prior to Defendant's trial, Danny Wilkins pled guilty to one count of burglary of a building and one count of theft of property. Mr. Wilkins testified at Defendant's trial that he met Defendant about eight months before the burglary. Mr. Wilkins said that his daughter, Amber, called him on Sunday night, October 28, around 5:30 p.m., and asked him to pick her up at Mr. Harris' house. Mr. Wilkins asked Defendant for a ride because his truck was at Mr. Harris' shop for repairs. Defendant arrived at Mr. Wilkins' house around 6:30 p.m. The two men drove to Mr. Harris' house, arriving around 7:30 or 8:00 p.m., but no one was home. Mr. Wilkins said that they then drove to Mr. Harris' shop because he thought Amber might be there. When they arrived, Mr. Wilkins entered the building first, followed by Defendant. Mr. Wilkins admitted that he planned "to take some things" out of the shop which he intended to sell later.

Mr. Wilkins testified that after the burglary, he and Defendant arrived at L. B. Luna's house around 9:30 p.m. and sold Mr. Luna one of Mr. Harris' chainsaws for $100. Mr. Luna paid $40 in cash and wrote a check the next day payable to Mr. Wilkins for the remaining $60. Mr. Wilkins split the cash with Defendant. The next afternoon, Mr. Wilkins and Defendant sold the rest of the tools to Jackie Luna, L. B. Luna's nephew, for $350.00. Defendant's girlfriend, Kim Henson, and L. B. Luna drove with Defendant and Mr. Wilkins to Jackie Luna's house. Jackie Luna wrote a check for the sales price made payable to Mr. Wilkins. After he cashed the check, Mr. Wilkins said that he shared the proceeds with Defendant.

On cross-examination, Mr. Wilkins admitted that he lied in his first statement to the police to protect himself. He said that the only thing he did not like about Mr. Harris' relationship with his ex-wife was the fact that the couple attempted to keep their relationship a secret. He conceded that maybe this factor was a small part of the reason he broke into Mr. Harris' shop. Mr. Wilkins said that he was drinking every day at the time of the burglary. He could not remember whether Ms. Henson overheard any part of the transaction with Jackie Luna or whether she stayed in the truck.

On redirect, Mr. Wilkins said that Defendant was drinking that night also. In addition, Mr. Wilkins said that he could not have lifted Mr. Harris' tool box by himself. Mr. Wilkins denied stopping in Bucksnort, Tennessee on Sunday night or meeting two men from Illinois.

L. B. Luna and Mr. Wilkins had previously worked together at the Turney Center, but Mr. Luna did not know Defendant. Mr. Luna did not ask Mr. Wilkins if the chainsaw was stolen and thought that $100 was a fair price for the used tool. On cross-examination, Mr. Luna said that he wrote the check payable to Mr. Wilkins because he knew him and did not know Defendant. He did not recall telling the police that only Mr. Wilkins negotiated the price of the chainsaw, but Mr. Luna could not remember anything that Defendant specifically said that night.

Jackie Luna also knew Mr. Wilkins from the Turney Center and had not met Defendant before the two men sold him the tools. Mr. Luna also did not ask whether the tools were stolen and figured that the two men simply needed some money. He made the check payable to Mr. Wilkins because he did not know Defendant. After he wrote the check, Defendant backed the truck up to Mr. Luna's garage, and Mr. Wilkins and Defendant unloaded the truck. Mr. Luna said that both men were intoxicated.

The next morning, Mr. Luna discovered Defendant, Mr. Wilkins and Ms. Henson in the driveway in Defendant's truck. Mr. Luna said they could come into his house and wait for the bank to open. Mr. Wilkins passed out on the floor, and Defendant walked around Mr. Luna's house asking questions about various items such as Mr. Luna's computer. The trio left around 8:45 a.m.

Mr. Luna became suspicious when Defendant toured his house and called his cousin who was a part-time deputy. He told his cousin that he might have bought some stolen tools, and the message was relayed to Jimmy Barnett, a detective with the Hickman County Sheriff's Department.

Detective Barnett said that he ran the serial number from the chainsaw purchased by L. B. Luna through the system and discovered that it had been stolen. He contacted Richard Smith, a detective with the Dickson County Sheriff's department, and Detective Smith brought Mr. Harris to Hickman County to identify the property.

After Mr. Harris confirmed that the property was his, Detective Smith obtained arrest warrants for Mr. Wilkins and Defendant. Defendant was given his Miranda warnings and interviewed by Detective Smith. Defendant told Detective Smith that he picked Mr. Wilkins up in his truck around 6:00 p.m. on Sunday. The two men stopped at a bar in Bucksnort and met two men

from Illinois. The four men later proceeded to a bar in Dickson County. The two men from Illinois borrowed Defendant's truck to get some more beer, and when they returned, the bed of the truck was filled with tools. The group returned to Bucksnort and unloaded some of the tools into the Illinois men's Chrysler. Defendant admitted that he and Mr. Wilkins sold the rest of the items to L. B. and Jackie Luna. Defendant said he hid the deer stand behind the bar in Bucksnort, but it was never recovered. Defendant could not explain how the men from Illinois knew where Mr. Harris' shop was located.

On cross-examination, Detective Smith said that there was no indication in Defendant's oral statement that he knew the tools were stolen. Detective Smith also said that Jackie and L. B. Luna told him that Mr. Wilkins did most of the negotiating over the sales price of the tools. No fingerprints were found in the shop, and the equipment was not dusted for prints.

**Motion for a Continuance**

Defendant's trial was set for May 23, 2002. Late in the afternoon of May 21, Defendant discharged his appointed counsel, Jerred Creasey, and retained private counsel to represent him at trial. Defendant's new counsel, Kenneth Crites, filed a motion for a continuance on the day of the trial arguing that he needed additional time to adequately prepare for trial and interview certain witnesses, specifically Kim Henson.

At the hearing on Defendant's motion, Defendant said that he retained new counsel because he was "uncomfortable" with Mr. Creasey's representation. In addition, Defendant's brother-in-law, James Hendricks, told him that he overheard Mr. Creasey say at some point that he did not care if Defendant went to jail or not. A guilty plea submission hearing was scheduled for Friday, May 17. Defendant said that he decided not to plead guilty and left the courthouse with his brother-in-law around 1:00 p.m. Although he decided to engage new counsel after the plea submission hearing, Defendant said that he did not contact a new lawyer over the next few days because he was working.

David Totty, Defendant's father, said that he was concerned about Mr. Creasey's involvement in his son's case when he heard about the remark from Mr. Hendricks. He said that he first met with Mr. Crites the day before the trial was scheduled to begin. Mr. Totty said that it was his decision to hire new counsel since Mr. Totty was paying Defendant's attorney fees.

Mr. Totty said that he had known the scheduled date of his son's trial for months. He waited nearly five days after the guilty plea submission hearing to contact Mr. Crites because he did not want to make a "leap decision." Mr. Totty admitted on cross-examination that his son had not been employed full time for about four months and was only doing odd jobs at the time of the trial.

Mr. Creasey said that he first met with Defendant and his father about two weeks after Defendant's arraignment. Although a second meeting was scheduled, Defendant did not appear, and Mr. Creasey eventually mailed him the information that he had obtained through discovery. The State offered to settle Defendant's case, but Mr. Creasey could not locate Defendant to tell him of

the outstanding offer. He finally reached Defendant's sister who eventually told him that Defendant would take the offer. At the plea submission hearing, Defendant changed his mind several times about whether or not to plead guilty to the charges. Ultimately, around 4:00 p.m., Defendant decided to go to trial. Mr. Creasey did not find out from David Totty until the following Monday that the family was contemplating securing new counsel. Mr. Creasey said that Mr. Totty did not provide any reasons for this decision other than "[the trial] might be moved."

Defendant's father had asked Mr. Creasey to file a motion for a continuance before the plea submission hearing, but Mr. Creasey told him that they had no grounds for seeking a delay in the trial. Despite Mr. Totty's warnings that the family might engage other counsel, Mr. Creasey continued to prepare for trial. Mr. Creasey said that he was still prepared to represent Defendant if necessary and did not feel that he had any conflict in doing so. Mr. Creasey said he did not recall making any comment such as the one attributed to him by Mr. Hendricks. Mr. Hendricks did not testify at the hearing.

At the conclusion of the hearing, the trial court denied Defendant's motion for a continuance. The trial court found that Defendant had not been diligent in securing substitute counsel and did not find Defendant to be a credible witness as to his reasons why he wanted to engage new counsel or why he delayed in contacting Mr. Crites. In short, the trial court found that Defendant was "trifling with the Court."

Defendant argues that the trial court's denial of his motion for a continuance deprived him of his right to the effective assistance of counsel guaranteed by the Sixth Amendment. In his brief, however, Defendant does not present any argument or cite any authority in support of this position, and the issue is thus waived. *See* Tenn. R. Crim. App. 10(b); Tenn. R. App. P. 27(a)(7). Instead, Defendant bases his assertion that the trial court erred in denying his request for a continuance on the trial court's failure to give him the opportunity to interview and obtain the presence of Ms. Henson at trial. Defendant cites *State v. Frahm*, 737 S.W.2d 799, 802 (Tenn. Crim. App. 1987) in support of his position. Defendant contends that Ms. Henson was a material witness with exculpatory information, and that a different result in his trial might have reasonably been reached if Ms. Henson had testified.

It is well established that the decision to grant a continuance rests within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of prejudice to the defendant. *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999) (citing *State v. Melson*, 638 S.W.2d 342, 359 (Tenn. 1982)); *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). In order to reverse the judgment of the trial court, we must be convinced that Defendant "did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance." *Baxter*, 503 S.W.2d at 230.

The State points out that Defendant failed to support his motion for a continuance with an affidavit as required in *State v. Dykes*, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000), *superceded by statute as stated in*

*Robert Kuykendall v. State*, No. 03C01-9310-CR-00377, 1995 WL 75441, *5 (Tenn. Crim. App., Feb. 23, 1995). This omission alone, the State argues, justifies the trial court's denial of Defendant's motion for a continuance.

We recognize that in most cases, a defendant seeking a continuance on the basis of an absent witness must support the motion with an affidavit alleging the substance of the witness's testimony, the testimony's relevance and materiality to the defense, that the testimony was admissible and not cumulative, that the witness would be available at a later date, and that counsel exercised diligence in trying to obtain the witness' presence at trial. *See Dykes*, 803 S.W.2d at 257; *State v. Bennett*, 798 S.W.2d 783, 787-88 (Tenn. Crim. App. 1990); *State v. Frahm*, 737 S.W.2d 799, 802 (Tenn. Crim. App. 1987). This Court has also recognized, however, that the lack of a written affidavit is not always controlling. *State v. Edward Mitchell*, No. W1999-01314-CCA-R3-CD, 2001 WL 204180 (Tenn. Crim. App., Jackson, Mar. 1, 2001), no perm. to appeal filed; *State v. Alvin Glenn Hughes*, No. 02C01-9208-CR-00183, 1993 WL 193712 (Tenn. Crim. App., Jackson, June 9, 1993), no perm. to appeal filed. Cases relying on the mandatory filing of an affidavit in support of a motion for a continuance rely primarily on case law decided before the adoption of the Tennessee Rules of Criminal Procedure. *Hughes*, 1993 WL 193712, at *4. Tennessee Code Annotated section 40-18-103(c) provides that the trial court may grant a continuance upon "good cause shown."

Counsel was engaged to represent Defendant on May 21. He filed his motion for a continuance on May 23 just before the commencement of Defendant's trial. Counsel stated that he had had only twenty-four hours to review the discovery in the case. The trial court noted that it generally did not hold hearings on motions on the day of trial but due to the circumstances of this case was willing "to bend the rules a little bit." Although in *Hughes*, we observed that requiring counsel to file a supporting affidavit when seeking a continuance "is legitimately within the discretion of the courts," the trial court did not require an affidavit in this case. *Hughes*, 1993 WL 193712, at *4. Nor did the trial court deny Defendant's motion based upon the lack of an affidavit. *Id.* The trial court was very cognizant of the fact that counsel had been engaged less than forty-eight hours prior to trial. The hearing proceeded without objection from the State. Based on the totality of the circumstances, we do not believe that the lack of an affidavit is controlling in this case.

At the hearing on Defendant's motion for a continuance, counsel merely indicated that Ms. Henson appeared to be a material witness based upon a brief review of the file. Defendant did not offer any evidence as to the substance of Ms. Henson's expected testimony or whether she could be produced to testify. The trial court denied Defendant's request for a continuance, and the trial eventually concluded without the testimony of Ms. Henson.

In his motion for a new trial, Defendant provided the following statement from Ms. Henson:

> That Danny Wilkins stole tools and a chainsaw and put them on the truck. Some people were behind us. I didn't know where we were. We both told Danny to put the tools back. Michael Totty never touched the tools. David Mike Totty never had the tools or got any money. Danny was drunk and did the whole thing. I don't remember much else.

-6-

Mr. Crites said that the statement was not notarized because there were "questions relating to [Ms. Henson's] mental state." Mr. Crites acknowledged that Ms. Henson is a "mentally challenged adult" who was a resident of the Whitwell Impact Center Program in Centerville, Tennessee at the time Defendant's motion for a new trial was filed. Mr. Crites said that the Center anticipated the appointment of a conservator because of the state of Ms. Henson's mental competence.

Relying on this Court's decision in *State v. Reynolds*, 671 S.W.2d 854 (Tenn. Crim. App. 1984), Defendant argues that Ms. Henson's testimony would have been extremely favorable to Defendant and would show that Defendant did not consent to or participate in Mr. Wilkins' criminal activities. Defendant also submits that Ms. Henson's testimony is very "fact-specific," and that she is the only witness without a motive to lie.

We note at the outset that Defendant did not include a transcript of the hearing on his motion for a new trial in the record on appeal. The obligation of preparing a complete and adequate record for the issues presented on appeal rests upon the appealing party. Tenn. R. App. P. 24(b). In the absence of a transcript of the hearing, we must presume that the trial court ruled correctly. *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

Nonetheless, even without that presumption, we are not convinced that a different result would or might have reasonably been reached if Ms. Henson had testified. *Frahm*, 737 S.W.2d at 802. Credibility and availability problems aside, Ms. Henson's testimony is far from exculpatory. Defendant argued during the trial and on appeal that he did not know the tools in the back of his truck were stolen. Ms. Henson, on the other hand, said that both she and Defendant knew the tools were stolen, and that they urged Mr. Wilkins "to put them back." Her statement also contradicts Defendant's statement that two anonymous men from Illinois, not he and Mr. Wilkins, stole the tools when they borrowed Defendant's truck to purchase beer. The trial court found that Defendant had not presented any credible evidence that Ms. Henson's testimony would have been beneficial to Defendant. Based on the record available, we cannot say that the trial court abused its discretion in denying Defendant's motion for a continuance.

Defendant also argued for the first time in his motion for a new trial that the trial court erred in denying his motion for a continuance because counsel was not presented with adequate time to evaluate Defendant's competency to stand trial. Counsel admitted that he only became aware of what he perceived as Defendant's diminished mental capacity as the trial progressed. Defendant states in his motion that certain affidavits and medical records are attached as "Exhibit A" in support of his position, but a review of the record does not reveal this exhibit. The trial court found that Defendant did not present any reliable evidence that his mental state affected his ability to assist counsel or otherwise participate in his defense. In the absence of a record, we presume that the ruling of the trial court is correct.

Defendant is not entitled to relief on this issue.

**Sufficiency of the Evidence**

Defendant argues that the evidence was insufficient to support his convictions for facilitation of a burglary and theft of property. Defendant submits that the convicting evidence was presented only through the testimony of Defendant's accomplice, and the corroborating evidence of L. B. and Jackie Luna was insufficient to establish that Defendant knew that the goods were stolen.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A person commits burglary if, without the effective consent of the owner, the person "enters a building other than a habitation . . . not open to the public, with intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402. "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.,* § 39-11-403(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*., § 39-14-103.

Although the State did not introduce any physical evidence that Defendant was at Mr. Harris' shop the night of the burglary, Mr. Wilkins' testimony, if corroborated, certainly provides direct evidence that Defendant knew what Mr. Wilkins' intentions were when they arrived at Mr. Harris' shop, and that Defendant participated in the taking and selling of the goods. A conviction cannot be supported by the uncorroborated testimony of the defendant's accomplice. *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994). Whether or not an accomplice's testimony can sustain a conviction is a matter of the sufficiency of the independent evidence corroborating the testimony, not just the credibility of the accomplice. *See State v. Jackson,* 52 S.W.3d 661, 665-66 (Tenn. Crim. App. 2001). The corroborating evidence must be entirely independent of the accomplice's testimony and lead to an inference that Defendant was involved in the crime. *Bigbee,* 885 S.W.2d at 803 (citing *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Not every item of the accomplice's testimony, however, must be corroborated, and the corroborating evidence, in and of itself, does not have to be sufficient to support a conviction. *Hawkins v. State,* 469 S.W.2d 515, 520 (Tenn. 1971); *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999).

Mr. Wilkins testified that Defendant was with him when he stole the tools and accompanied him to L. B. Luna's home to sell the chainsaw. Mr. Wilkins also testified that he could not have lifted the tool box into the truck by himself. The description of the stolen property provided by Mr. Harris matched the tools purchased by L. B. and Jackie Luna which were in the back of Defendant's truck. Both Jackie and L. B. Luna said that Defendant was present during the negotiation of the sales price for the tools. Once Jackie Luna agreed to pay $350 for the tools, Defendant backed his truck up to Mr. Luna's garage and helped Mr. Wilkins unload the tools. Defendant spent the night in Mr. Luna's driveway. When Mr. Luna came up to the truck, Defendant asked him to write another check because he was having trouble cashing the check made payable to Mr. Wilkins.

Based on our review of the record, the evidence was sufficient to corroborate the testimony of Mr. Wilkins and support Defendant's conviction for facilitation of a burglary. We conclude that it was reasonable for the jury to find that Defendant knowingly furnished substantial assistance to Mr. Wilkins in the commission of the burglary while knowing that Mr. Wilkins intended to burglarize Mr. Harris' shop. *See State v. Hayes*, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999). (Evidence sufficient to conclude that the driver of the vehicle furnished substantial assistance to the passenger who committed robbery while the driver remained in the car.) Although only Mr. Wilkins testified as to Defendant's knowledge that the property was stolen, his testimony was sufficiently corroborated by the State's other witnesses to sustain a finding by the jury that Defendant exercised control over Mr. Harris' property without his consent and with the intent to deceive. The evidence is sufficient to support Defendant's conviction for theft of property.

If the evidence is sufficient to support his conviction for theft of property, Defendant contends that the evidence established that the actual value of the property was $400, the amount paid for the goods by Jackie and L.B. Luna. Defendant argues that this value is sufficient to sustain only a conviction for misdemeanor theft. We respectfully disagree.

Mr. Harris provided the police with a list of the stolen items and assigned a value to the stolen property in excess of $5,000. The list was admitted as an exhibit at trial. In addition, items not on Mr. Harris' initial list were also recovered, and Mr. Harris testified at trial as to the value of these items. Mr. Harris testified that the value of the large tool box alone was $2,000. Mr. Harris admitted that he only had sales receipts for the chainsaws, and Mr. Harris said that the value placed on the stolen property was based on his estimate of the replacement cost of each of the items.

The value of property for purposes of the theft offenses is either the fair market value of the property at the time and place of the offense, or, if the fair market value cannot be ascertained, then "the cost of replacing the property within a reasonable time after the offense." Tenn. Code Ann. § 39-11-106(36)(A). The owner of the property may testify as to its value. Tenn. R. Evid. 701(b). The determination of the value of stolen property is a question for the jury based on the evidence presented at trial. *State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981). Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found that the tools and other items had a value of more than $1,000. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE