IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 15, 2004

## STATE OF TENNESSEE v. ROBERT WAYNE MARLER, aka BOBBY MARLER

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S46,143      R. Jerry Beck, Judge**

---

**No. E2003-02179-CCA-R3-CD - Filed July 12, 2004**

---

A jury found the defendant guilty of two counts of reckless homicide, Class D felonies, and one count of especially aggravated robbery, a Class A felony. He contends on appeal that (1) the evidence was insufficient to corroborate the unindicted accomplice's testimony, (2) the trial court erred in refusing to grant a continuance in order to locate a material witness, and (3) he received ineffective assistance of counsel. The evidence is sufficient for any rational trier of fact to have found the essential elements of the offenses beyond a reasonable doubt. Upon consideration of the factors enumerated in State v. Howell, 672 S.W.2d 442, 445-46 (Tenn. Crim. App. 1984), we cannot conclude that the trial court abused its discretion in denying the continuance. The defendant's claim of ineffective assistance of counsel has been waived. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

Larry R. Dillow, Kingsport, Tennessee, for the appellant, Robert W. Marler, aka Bobby Marler.

Paul G. Summers, Attorney General and Reporter; Elizabeth Ryan, Senior Counsel; Randall E. Nichols, District Attorney General; and James F. Goodwin, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On February 12, 2002, a Sullivan County Grand Jury returned a three count indictment against the defendant, Robert Wayne Marler, charging him with the premeditated murder, felony murder, and especially aggravated robbery of Thomas Joe Williamson. On May 3, 2003, a jury found the defendant guilty of two counts of reckless homicide, Class D felonies, and one count of especially aggravated robbery, a Class A felony. Following a sentencing hearing, the trial court merged the two convictions for reckless homicide and sentenced the defendant to consecutive

sentences of twenty-two years on the especially aggravated robbery conviction and three years on the reckless homicide conviction, for an effective sentence of twenty-five years, to be served in the Tennessee Department of Correction. The defendant timely filed his notice of appeal.

## Facts

During the evening of September 3, 2001, a group of people including the defendant, Daniel McGuire, and Victoria Montoya gathered at the home of John Bellamy for a "get-together." This was the first time that McGuire had met the defendant. According to McGuire's trial testimony, sometime during the evening of September 3, he left with the defendant to go to the store for drinks and cigarettes. After leaving the store, the defendant asked McGuire if he wanted to go with him to visit the defendant's uncle. McGuire agreed, and the two of them drove to the Rocky Top Campground. Upon arriving, the defendant parked his vehicle on the other side of the road from the campground because the gate was closed. McGuire and the defendant walked up to a silver camper, and the defendant knocked on the door. A man with black hair and a glass eye on his left side, later identified as Thomas Joe Williamson, the victim, answered the door. McGuire had never seen the man before; however, the defendant and the man seemed to know each other. The men went inside the camper and sat down. They began conversing and smoking cigarettes. The defendant got a cigarette from the victim, smoked it, and put it out in the ashtray. He repeated these actions and said that he was getting ready to leave. As the defendant stood up, McGuire saw him reach for something in his back pocket. Suddenly, the defendant pulled out a knife and stabbed the victim two or three times in the chest. As the victim fought back, the defendant covered the victim's face with a pillow. The defendant asked McGuire if he was going to help and McGuire refused. Following the stabbing, the defendant removed the pillow from its case and placed numerous items from the camper into the pillowcase, including a bag of change and items that the defendant had touched while in the camper. However, McGuire never saw the defendant remove the victim's wallet. Before leaving, McGuire checked the victim's pulse and thought that he was still alive. The defendant and McGuire then left the camper, taking along the pillowcase. The defendant drove to the river, removed the bag of change from the pillowcase, placed a rock inside the pillowcase, and threw it into the water. According to McGuire, he did not receive any proceeds from the incident.

A couple of weeks later, the defendant told McGuire that he stabbed and robbed the victim because he thought "there would be a lot of money in his billfold." The defendant also told McGuire to "keep [his] mouth shut" about what had happened. McGuire later led police to the area of the river where the defendant had disposed of the pillowcase. Authorities recovered the pillowcase and the items inside. McGuire testified at trial that he had not been charged in connection with this incident and had not made any agreements with the district attorney's office. He also said that he was not aware of any reward offered in the case prior to trial.

Victoria Montoya also testified at the defendant's trial. She met the defendant during the summer of 2001. They became friends and later became roommates. She recalled seeing the defendant arrive at Bellamy's apartment around 10:00 p.m. on the night of September 3, 2001. Although she did not see the defendant and McGuire leave together, she did notice that they were

-2-

both gone at the same time. Around 1:00 a.m., Montoya again saw the defendant at Bellamy's apartment. The defendant and Montoya left together and returned to their home. During the following week, Montoya observed what she considered to be unusual spending habits by the defendant. A few days after the stabbing, Montoya and the defendant were traveling together in his vehicle. As the vehicle passed over the Netherland Inn Bridge, the defendant asked Montoya to roll down her window and lean back. As they crossed the bridge, the defendant tossed out a brown wallet with a chain wrapped around it. Montoya had never seen the wallet before. She did not mention the wallet to police in her initial statement because, according to her, she did not think the incident was suspicious. However, she testified that she later learned that a wallet belonging to the victim was recovered from the area near the Netherland Inn Bridge. Realizing the wallet's significance, she told the police about the defendant's actions in her second statement. She said that she was aware of a $10,000 reward when she gave her second statement.

On October 9, 2001, Jeffrey Ketron and Earl Byington were fishing near the Netherland Inn Bridge. During this time, Byington found a wallet in the water about twenty to thirty feet from the bridge. The wallet was brown and had a chain wrapped around it. After examining the contents of the wallet, the men contacted the sheriff's department. The wallet was positively identified as belonging to the victim.

Danielle Higgins, John Bellamy's daughter, also testified on behalf of the State. She said that she met the defendant while at her father's home during December 2001. Her father and the defendant were drinking. Bellamy went into the other room for a few minutes leaving Higgins and the defendant alone. While the two of them were conversing alone in the living room, the defendant volunteered that

> "he had went up on the mountain to rob a guy and that things went bad and he stabbed [sic]. . . . And he said that someone I knew was with him and I asked who and he said Daniel, which the only Daniel that I know he could have a friend to is my cousin, Daniel McGuire."

Another witness, Joshua Hillenberg, testified that he was the defendant's friend. He stated that he was present at the defendant's apartment when a police detective was there questioning the defendant about a murder. According to Hillenberg, after the detective left, he asked the defendant "if he had done it," to which the defendant replied "yes." Hillenberg asked him why, and the defendant stated that "he needed the money." Hillenberg also testified that he was currently incarcerated but he had received no promises in exchange for his testimony.

Agent Robert McFadden, an expert in latent print identification, processed the victim's camper and vehicle at the TBI crime lab in Nashville. He was able to develop numerous prints from items tested. None of the prints matched the defendant. The prints were not compared to those of Daniel McGuire. The majority of the latent prints were never identified. One of the identified prints was matched to David Allen White. However, Detective Steve Williams testified that White had been ruled out as a suspect. McFadden was not able to recover any prints from the wallet or the items located in the pillowcase.

Agent Hunter Green, an expert in serology and DNA examination, received several of the items involved in this case for testing. The items submitted from the camper were five knives, a pair of scissors, nine cigarette butts, an ashtray, and a pillow. Also submitted for testing was the pillowcase and its contents found in the river. Presumptive tests indicated the presence of blood on the pillow recovered from the camper. Green stated that DNA testing was never requested nor performed on the cigarette butts or ashtray.

Dr. Mona Gretel Case Harlan Stephens, an expert in forensic pathology, examined the victim's body. She determined that the victim had received two small stab wounds to the left chest. In her opinion, the victim died of internal bleeding resulting from the stab wounds. She estimated that the victim died within a few minutes of being stabbed.

The defendant was the only witness presented on his behalf. He testified that he did construction work with the victim. According to the defendant, he and the victim were friends and he had been to the victim's camper on many occasions. He said that on the night of September 3, 2001, he went to John Bellamy's apartment for an hour or two and then left alone around 8:45 p.m. and went to Sharri and David White's apartment. He stated that he met Daniel McGuire for the first and only time at Bellamy's home that night. However, he denied that he ever went anywhere with McGuire. The defendant testified that he has never met Danielle Higgins. He denied participating in the stabbing and robbing of the victim in any way.

**Analysis**

The defendant contends on appeal that (1) the evidence was insufficient to corroborate the unindicted accomplice's testimony, (2) the trial court erred in refusing to grant a continuance in order to locate a material witness, and (3) he received ineffective assistance of counsel.

I. Sufficiency

The defendant contends that Daniel McGuire was an accomplice in the commission of the charged offenses and that there is insufficient evidence to corroborate McGuire's testimony. In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. Id. This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences which may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a

reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Furthermore, accomplices cannot corroborate each other. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the undisputed evidence clearly establishes that the witness is an accomplice as a matter of law, the trial court, not the jury, must decide this issue. State v. Lawson. 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness is an accomplice. Id. An accomplice is not "'a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense." Pennington v. State, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 Wharton's Criminal Evidence § 448 (12th ed. 1955)). ' In determining if a witness is an accomplice, the jury must determine whether such witness knowingly, voluntarily, and with common intent united with the principal offender to commit the offense or offenses under investigation. Monts v. State, 214 Tenn. 171, 379 S.W.2d 34 (1964). If they so find, the issue of whether the witness's testimony has been sufficiently corroborated becomes a matter entrusted to the jury as the trier of fact. Bigbee, 885 S.W.2d at 803.

> In order to qualify as corroborative evidence,
> "'[t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity.'"

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (quoting Hawkins v. State, 4 Tenn. crim. App. 121, 469 S.W.2d 515 (1971)). The corroborative evidence may be direct or circumstantial and is not required to be sufficient, standing alone, to support a conviction. Id. The corroborative evidence is sufficient if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). In addition, corroboration is sufficient even though the evidence is slight and entitled, when standing alone, to but little consideration. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). The corroboration need not extend to all portions of the accomplice's evidence. Bigbee, 885 S.W.2d at 803.

The trial judge correctly determined that the jury should decide if Daniel McGuire was an accomplice. The trial judge gave a complete and accurate charge to the jury on the issue of whether McGuire was an accomplice and how his testimony should be weighed. Obviously, we do not know whether the jury determined that McGuire was an accomplice. If the jury found that the witness was not an accomplice, his testimony could be given the same weight as any other witness, without the

requirement that it be corroborated. On the other hand, if the jury found that McGuire was an accomplice, there would have to be some evidence that sufficiently corroborated his testimony. In either case, the record supports the jury's finding.

Montoya testified that the defendant discarded a brown wallet with a chain wrapped around it near the Netherland Inn Bridge. Approximately two months later, a brown wallet with a chain wrapped around it was found near the Netherland Inn Bridge. The wallet discovered near the bridge belonged to the victim. Additionally, the defendant's admissions to Higgins and Hillenberg also connect the defendant to the crimes committed. The evidence is sufficient for any rational trier of fact to have found the essential elements of the offenses beyond a reasonable doubt.

II. Continuance

The defendant also submits that the trial court erred in refusing to grant a continuance in order to locate a material witness. The decision whether to grant a motion for a continuance is a matter of discretion for the trial court, the denial of which will not be overturned on appeal absent a clear showing the trial court abused its discretion to the prejudice of the defendant. State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982); Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). In order to establish an abuse of discretion, the complaining party must make a clear showing of prejudice as a result of the continuance being denied. State v. Teel, 793 S.W.2d 236, 245 (Tenn. 1990). A party seeking a continuance for the purpose of obtaining evidence must demonstrate to the court the necessity for the continuance. In order to satisfy this burden, the moving party must: (1) file an affidavit with the court showing good cause and specifying the testimony sought, (2) show that the testimony of the witness sought would be material to the issues in the case, (3) show that the evidence is not merely cumulative, (4) show that the witness would be available at a later date, and (5) demonstrate that reasonable diligence was exercised to obtain the witness's presence. State v. Howell, 672 S.W.2d 442, 445-46 (Tenn. Crim. App. 1984).

On the second day of trial, April 30, 2003, defense counsel informed the trial court that a subpoena was issued on March 17, 2003, for Amy Snodgrass, a defense witness. According to counsel, the subpoena was returned unserved. The trial court delivered an instanter subpoena to Officer Bogle in an attempt to have her served immediately. The officer left and attempted to locate Snodgrass. Later in the day, the officer returned and reported that he was unable to locate the witness. According to information the officer received from the witness's neighbors, she was "hiding." The trial court informed defense counsel that if the witness was avoiding service, the court would have her attached and detained on a material witness bond.

The following day, May 1, 2003, defense counsel asked the trial court for an attachment for Snodgrass. Following sworn testimony by Officer Bogle, the court issued an attachment for the witness. The trial court found that Snodgrass was a material witness upon learning from defense counsel that Snodgrass gave a statement in which she implicated McGuire as a possible accomplice or perpetrator in the offenses committed against the victim in this case. After receiving information that the witness attended a local college, the trial court sent Officer Bogle to the school with the

instanter subpoena. Before the court recessed for lunch, the court noted that it had not yet been contacted by Officer Bogle concerning whether he was able to locate the missing witness. The State informed the court that it would be concluding its case in chief during the afternoon. The trial court asked defense counsel if he would be ready, to which he responded, "I'm ready." During the afternoon, the officer returned and informed the court that he was unable to locate the witness at the school. However, he was informed by school personnel that Snodgrass was scheduled to take an exam the following morning. According to Bogle, another officer was currently attempting to locate the witness at her home.

Following further testimony, the State rested its case on May 1, 2003. Defense counsel asked for a continuance in order to further attempt to locate Snodgrass. The court agreed to continue the trial until the following day. Before conclusion of the day's business, the court indicated that it was still unable to locate the witness. The court stated that several officers were looking for Snodgrass, and defense counsel stated that he also had someone looking for her. Officer Bogle was instructed to be at the witness's school at 8:00 the following morning. The court recessed until the following day.

On May 2, 2003, the trial court stated that the witness had not been located. According to Officer Bogle, Snodgrass did not show up for her scheduled exam, and school personnel informed him that she had been absent for two weeks. Defense counsel again asked the court for more time in order to locate the witness. The trial court found that two subpoenas had been issued directing the witness to the trial date of April 28, 2003. The first subpoena was issued on November 14, 2002, and the second was issued on March 17, 2003. Both subpoenas were returned unserved. Additionally, police officers and someone working on behalf of defense counsel had been unsuccessfully attempting to locate the witness over the past two days. Defense counsel informed the court that he had no additional information on the witness's whereabouts. He also stated that he did not expect to locate the witness "anytime soon." In overruling the motion to continue, the court stated that "if [the court] had [the] least bit of hope that additional time would help, I would grant it, but I, I think we just ran out of places to look . . . ." Upon consideration of the factors enumerated in Howell, 672 S.W.2d at 445-46, we cannot conclude that the trial court abused its discretion in denying the continuance. The defendant failed to file an affidavit with the court and failed to show that the witness would be available at a later date. The defendant is not entitled to relief on this issue.

III. Ineffective Assistance of Counsel

Defense counsel also contends that he was ineffective for announcing that he was ready for trial when a material witness had not been served by subpoena. This Court has noted "that the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing." State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (quoting Kirby George Wallace v. State, No. 01C01-9308-CC-00275, 1994 Tenn. Crim. App. LEXIS 591, at *8-9 (Tenn. Crim. App., at Nashville, Sept. 15, 1994)). We also note that the same attorney who represented the

defendant at trial is now arguing his own ineffectiveness. On direct appeal, as in a post-conviction proceeding, the defendant is required to prove the ineffectiveness of counsel by clear and convincing evidence. State v. Burns, 6 S.W.2d 453, 461 n.5 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). A claim of ineffective assistance of counsel presents a mixed question of law and fact subject to de novo review. Burns, 6 S.W.3d at 461. The trial court's findings of fact are entitled to a presumption of correctness unless the evidence preponderates against those findings. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, a trial court's conclusions of law are subject to a purely de novo review with no presumption of correctness. Id. When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted).

The State contends that this issue has been waived because it was not raised in the defendant's motion for new trial. See Tenn. R. App. P. 3(e). We agree with the State that this issue has been waived on appeal. In any event, the defense counsel's bald assertion that he was ineffective is insufficient to establish prejudice. We do not know what the witness's testimony would have been. "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This issue is without merit.

## Conclusion

Based on the foregoing reasoning and the record as a whole, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE