# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 20, 2014 at Knoxville

## STATE OF TENNESSEE v. DEMONTRE CHAVEZ BROWN

**Appeal from the Circuit Court for Bedford County**
**No. 17504      Lee Russell, Judge**

**No. M2013-02091-CCA-R3-CD - Filed July 30, 2014**

In this appeal, the Defendant, Demontre Chavez Brown, challenges his conviction for aggravated robbery, a Class B felony, and subsequent sentence of twelve years' incarceration. Specifically, he alleges that (1) the evidence was insufficient to support his conviction because the witnesses' testimonies had material inconsistencies and his co-defendant's testimony was inadequately corroborated; (2) the trial court improperly allowed his co-defendant to testify because the State did not provide him with sufficient notice of such; and (3) the trial court's imposition of the maximum sentence was excessive because the Defendant's record contained mostly petty juvenile offenses. Upon consideration of the record and relevant case law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., and JEFFREY S. BIVINS, Sp.J., joined.

Emeterio Ramos Hernando, Lewisburg, Tennessee, for the appellant, Demontre Chavez Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Robert Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The case arises from the coordinated, simultaneous aggravated robberies of the P&R Market and Economy Liquors by the Defendant and three other men: Christopher Kinzer, Octavius Wyatt, and Davontay Holt . The Defendant, who was a juvenile at the time of the

offense, was originally charged with aggravated robbery and theft of property, valued at $1,000 or more but less than $10,000, of the P&R Market, committed on August 13, 2012. After a juvenile transfer hearing was held, at which it was determined that the Defendant's case should be tried in the criminal court, the Defendant was indicted by a grand jury on October 22, 2012, for aggravated robbery, a Class B felony, and theft, a Class D felony, of the P&R Market. Counsel was appointed, and a trial date was set. Two days before trial, the Defendant was informed that one of his co-defendant's, Christopher Kinzer, would testify against him at trial. Immediately, prior to Kinzer's testimony, the Defendant moved to exclude Kinzer's testimony on grounds that the State provided him with insufficient notice that Kinzer would be testifying against him. The trial court denied the motion after clarifying that the Defendant was solely seeking to exclude Kinzer's testimony, noting that the Defendant was aware that Kinzer would testify for the State two days prior to trial.

The following pertinent evidence was presented at the Defendant's trial on April 29-30, 2013. Natasha Gunning, a store clerk at the P&R Market convenience store, testified that she was working in the store on August 13, 2012, when two masked, black men entered the store, demanding money; both men had guns and were wearing white gloves. The men stole approximately $1,086 from the cash register and money bags in the store and also took at least five cartons of Newport cigarettes, valued between $50 and $60 per carton. Ms. Gunning testified that one of the men's mask slipped at some point, that she saw his eyes, and that she believed she could recognize his eyes if she ever saw him again. She also testified that one of the men was approximately her height, 5'7". The other man was taller and less aggressive. Ms. Gunning testified that the shorter, more aggressive man threatened to shoot her and that she stopped looking because she was afraid that she would die and did not want to see it happen. Ms. Gunning further testified that she was threatened regarding her testimony in this case a few weeks after the aggravated robbery and that she now suffers from post-traumatic stress disorder. She admitted on cross-examination that she did not recognize the Defendant.

Jeremy Haywood, a patrol sergeant with the Columbia Police Department (CPD), testified that he was familiar with the Defendant and that he knew the Defendant and his co-defendants to be friends. Based on prior dealings with the Defendant, Sgt. Haywood had secured a warrant to place a tracking device on the Defendant's 2003 Grand Marquis. On August 13, 2012, he was monitoring the Defendant's tracking device to ensure its accuracy when he noticed that the car was in Shelbyville, Tennessee. Sgt. Haywood contacted the Shelbyville Police Department (SPD) to inform that he had been tracking the Defendant's car and that it was in Shelbyville. Later, the dispatcher called Sgt. Haywood, informed him of the armed robberies, and asked him to track the Defendant's car. Sgt. Haywood located the car and identified the Defendant's car from a picture. Sgt. Haywood continued to monitor the Defendant's car as it moved from a trailer park location to an apartment complex and

notified the SPD of this information.

Sergeant Fred Harvey, a shift supervisor with the SPD, testified that he was a very short distance away from the P&R market when he was dispatched to the scene to investigate a theft. When he arrived, he saw two men running from the sidewalk area near the market area; he activated his blue lights and pursued them. Sgt. Harvey said that one of the men had a backpack, and both men had something covering their faces. Arriving at a wooded area, he began a foot pursuit but lost the men quickly. Sgt. Harvey then proceeded through the wooded area, ultimately arriving on Barksdale Street directly across from Farrar's Trailer Park, where he encountered Officer David Dye. He relayed to Officer Dye a description of the men he had been chasing and the direction in which he saw the men traveling. Shortly after Officer Dye left, Sgt. Harvey saw a car leaving the trailer park, heading in the direction of Bedford Manor Apartments and informed dispatch; this was also the direction in which Officer Dye had driven. Sgt. Harvey then began walking down the street towards the trailer park and, ultimately, Bedford Manor Apartments (Bedford Manor), and dispatch informed him that Officer Dye had located the car. Upon arriving at the apartments, he saw that Officer Dye had a white Ford Mercury Marquis blocked in and that two of the suspects – one of which was the Defendant – had been taken into custody.

Officer Dye, a patrolman with SPD, testified that after conferring with Sgt. Harvey, he saw a white, four-door Grand Marquis exit the trailer park, and he followed it. The car pulled into Bedford Manor Apartments, turned off its lights in the driveway, and pulled into a parking spot. Officer Dye pulled behind the car and saw Octavius, whom he had prior dealings with, get out of the driver's side of the car and an unknown man get out on the passenger's side. Officer Dye then got out of his cruiser; while he was conversing with Wyatt, the passenger ran, and Officer Dye pursued. He lost the suspect, and when he returned to the car, Wyatt was gone. After securing the scene, Officer Dye obtained the address of an apartment in Bedford Manor that Wyatt was known to frequent; he and Deputy Farrell[1] then went to the apartment and asked the tenant, Adriana White, who was just returning home, for permission to enter. She consented and advised that no one was supposed to be in the apartment. Upon opening the door, Officer Dye saw two black males standing inside. The men, later identified as the Defendant and Wyatt, ran into a bedroom but were ultimately taken into custody. Ms. White then consented to a search, and officers found large amounts of cash, Newport cigarettes, clothes, and shoes with mud on them; the former two were found in the bedroom in which the Defendant was apprehended.

SPD Detective Sam Jacobs testified that he was assigned to investigate the aggravated robberies of the P&R Market and Economy Liquors. Upon his arrival in the area, he was

---

[1] No first name was given.

informed that the Defendant's car had been blocked off and seized. When Jacobs peered into the car, he saw guns in plain view. As part of his investigation, he took photographs and participated in the search of the Defendant's car. During that search, the following items were found: a revolver, in plain view, on the back seat; a .45 caliber semi-automatic gun, also in plain view, on the driver's seat near the center console; a 9-millimeter semi-automatic gun, in the glove compartment; cartons of Newport cigarettes in the front seat on the passenger's side; and two "walkie talkies," one in the front seat and one in the back. Det. Jacobs also collected evidence leading from the wooded area in Bedford Manor towards the trailer park area; he found items that had been reported as stolen from Economy Liquors during the coordinated robberies. The trail of evidence led back to the location in the trailer park where the global positioning service (GPS) on Defendant's car reflected that it was just prior to the robbery, per Sgt. Haywood.

Sergeant Brian Crews, a detective with SPD, testified that he was the lead detective assigned to the aggravated robbery of the P&R Market. After being informed that three suspects had been taken into custody and speaking with Adriana White, he called an evidence technician to process her apartment. During that search, the following additional evidence was collected from the room where the three men were apprehended: a .40 caliber semi-automatic gun, with one bullet in the chamber and a magazine; "some cash"; Newport cigarettes; muddy clothes, noting that muddy footprints had been left at the crime scene and that it had been raining earlier that day. In other parts of the house, officers found a backpack with an empty money bag, another empty money bag, and a bandana. Sgt. Crews then returned to the P&R Market to watch the surveillance video of the robbery.[2] According to Sgt. Crews, his investigation revealed that the Defendant and Kinzer went into the P&R Market together, while Wyatt and Holt went into Economy Liquors. He explained that co-defendants Kinzer and Wyatt each relayed to him "who did what" during the two aggravated robberies. Additionally, Sgt. Crews also testified that Ms. Gunning stated that the more aggressive perpetrator during the robbery was approximately her height, 5'7", and the other one was taller; his investigation revealed that the Defendant was about 5'7" or 5'8" and that Kinzer was 5'11", thus providing further evidence that the Defendant and Kinzer went into the P&R Market.

On cross-examination, Sgt. Crews admitted that he could not identify the perpetrators from the video nor could he distinguish heights but that he could tell that one perpetrator, the one standing across the counter and described by Ms. Gunning as taller than her, was tall. Sgt. Crews also admitted that the Defendant's brother was the apartment renter's boyfriend

---

[2] Because P&R Market and Economy Liquors were owned by the same person, Sgt. Crews was able to view the surveillance videos of both stores simultaneously, which confirmed his belief that the two robberies were a coordinated effort between the Defendant and his three cohorts.

and that the Defendant had "a reason to be there at the apartment, visiting with his brother[.]" He further admitted that no proceeds from the aggravated robbery were found on the Defendant's person and that he never asked Ms. White if the cigarettes found in the apartment belonged to her. On redirect, Sgt. Crews clarified that no one was in the apartment when officers arrived, other than the Defendant and two of his co-defendants. He also stated that because of the GPS information from the Defendant' car and also because the Defendant ran when officers entered the apartment, it was possible – but improbable – that the Defendant was neither aware of nor involved in the aggravated robberies committed using his car.

Jay Patel, the manager of Economy Liquors and P&R Market, testified that approximately $1,000 in cash was taken from P&R Market, not including the cartons of Newport cigarettes that were also stolen.

Kinzer testified that he, the Defendant, and Davontay Holt arrived in Shelbyville via separate cars, one of which was the Defendant's, on August 13, 2012. Upon arrival, they went to Adriana White's apartment where the Defendant and Holt started talking about a robbery, involving the Defendant, Holt, himself, and Wyatt. The Defendant had a gun for each of them in his car: he had the .40 caliber; the Defendant had the revolver; Wyatt had the .45 caliber; and Holt had the 9-millimeter. They also wore gloves, which they got from Ms. White's house. Kinzer and the Defendant wore hoodies and shirts around their faces. The Defendant drove to a trailer park "down the street" to go commit the robberies and parked in a "dead end." After agreeing that he and the Defendant would go in one store while the others went in the other store, they walked through "a cut" to get to the stores. Once inside the P&R Market, Kinzer turned off the lights, and the Defendant ordered the clerk to go behind the counter, open the cash drawer, and remove the money. He put the money in a backpack he was carrying, and the Defendant ordered the clerk to get onto her knees. They demanded more money, and the clerk told them about the additional money bags but explained that the safe was in the liquor store. Kinzer grabbed the other money bags, and the Defendant grabbed cartons of Newport cigarettes; they then "fled" the store and returned to the Defendant's car to meet with Wyatt and Holt. When Wyatt and Holt arrived, their bag was empty, and they advised him and the Defendant that they had to drop the bag because they were being chased by the police, and it had gotten too heavy. According to Kinzer, the Defendant was driving; he was behind the Defendant; Holt was in the front passenger's seat; Wyatt was behind him. On their way back to Bedford Manor, they were followed by police. Wyatt and Holt got out of the car, and he and the Defendant stayed inside. When the officer started chasing Holt, the men went inside Ms. White's apartment, changed clothes, and split the money four ways.

On cross-examination, Kinzer stated that he had decided to become a witness for the

State about one to two months prior to trial and that he communicated that intention to his attorney at that time. He insisted that he never changed his mind about testifying. Kinzer relayed that he had never attended any meeting or participated in any testimony preparation prior to trial. On redirect, Kinzer noted that the clerk was very scared during the aggravated robbery and that such could explain any inconsistencies in their testimonies.

The jury convicted the Defendant of aggravated robbery, and a sentencing hearing was held on June 21, 2013.[3] At that hearing, the State offered multiple exhibits; no witnesses were presented by either party. After reviewing the exhibits and considering counsels' arguments, the trial court sentenced the Defendant as a Range I, standard offender to serve twelve years, with release eligibility after serving eighty-five percent, in the Department of Correction. The Defendant filed a motion for new trial, which was subsequently denied, and then filed a timely appeal to this court.

ANALYSIS

In this appeal, the Defendant alleges that (1) the evidence was insufficient to support his aggravated robbery conviction because Ms. Gunning's and Kinzer's testimonies were materially inconsistent, and as such, co-defendant Kinzer's testimony was insufficiently corroborated; (2) the trial court improperly allowed Kinzer to testify because the State did not provide him with sufficient notice of such; and (3) the trial court's imposition of the maximum sentence was excessive because the Defendant's record contained mostly petty juvenile offenses. The State responds that (1) the evidence was sufficient to support his conviction, noting that Kinzer's identification was sufficient to connect the Defendant to the crime and that the testimony from the witnesses and the exhibits, as a whole, provided sufficient corroboration of Kinzer's testimony; (2) that the Defendant failed to prove that he was prejudiced by the State's informing him of Kinzer's intent to testify two days before trial, or that the State gained an unfair advantage as a result of the late disclosure, or that the State acted in bad faith; and (3) that the trial court properly sentenced the Defendant to the twelve-year maximum because the Defendant had a history of committing theft-related and violent offenses.

*I. Sufficiency of the Evidence*

The Defendant contends that his aggravated robbery conviction cannot be sustained because the testimonies of the witnesses' contained material inconsistencies and because Kinzer's testimony identifying him as the other perpetrator of the robbery at the P&R Market

---

[3] The theft of property charge was dismissed.

was insufficiently corroborated. He explains that because Ms. Gunning could not identify the Defendant as one of the two perpetrators, and no other evidence proved that the Defendant was involved in the robbery, Kinzer's identification was insufficiently corroborated. The State responds that both physical evidence and circumstantial evidence created an inference that the Defendant was involved in the robbery and such was sufficient to corroborate Kinzer's testimony. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated section 39-13-401 defines robbery as the intentional or knowing theft of property from the person of another by violence or putting the person in fear. As relevant to this case, robbery is elevated to aggravated robbery when it is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402. A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. Id. § 39-14-103.

We will first address the sufficiency of the evidence supporting the Defendant's aggravated robbery conviction. Our review of the record reveals that Kinzer testified that he and the Defendant robbed the P&R Market, that they both had guns, that the Defendant provided those guns, and that the Defendant drove his car to commit the robbery. Sgt. Harvey's and Officer Dye's testimonies and the GPS unit on the Defendant's car, provided further evidence that the Defendant's car was used in the commission of the aggravated robbery. Upon searching the Defendant's car, three guns were found inside, as well as items reported as stolen from the P&R Market. When Officer Dye pursued a lead regarding an apartment where Wyatt – whom he had seen exit the Defendant's car with another person who then fled from Officer Dye just after the robbery – was known to frequent, the Defendant, Wyatt, and Kinzer were found in that apartment. When officers entered the apartment, saw the Defendant and Wyatt, and requested that they put their hands up, he and Wyatt attempted to flee. Once apprehended, officers searched the bedroom to which the Defendant had fled and found "some cash" and Newport cigarettes, which were reportedly stolen from the P&R Market. Therefore, we conclude that the evidence was sufficient to support the Defendant's aggravated robbery conviction and that any inconsistency in the witnesses' testimonies was resolved by the jury's guilty verdict. See Bland, 958 S.W.2d at 659 (noting that the jury's verdict resolves all credibility issues and conflicts in testimony); see also Sheffield, 676 S.W.2d at 547 (stating that this court presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State).

Turning to the corroboration issue, it is well-settled that "[o]ne may not be convicted on the uncorroborated testimony of an accomplice." See State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997) (citing Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811 (1959)). "The corroborative evidence may be direct or circumstantial" and "need not be, of itself, sufficient to support a conviction." McKinney v. State, 552 S.W.2d 787 (Tenn. Crim. App. 1977). Slight circumstances are sufficient to meet the required degree of corroboration. Robinson, 971 S.W.2d at 42; see State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). In State v. Griffis, 964 S.W.2d 577 (Tenn. Crim. App. 1997), this court held that

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

Id. at 588-89 (quoting Sherrill v. State, 321 S.W.2d 811, 815 (Tenn. 1959), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013)). In addition, our courts have stated as follows:

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

Id. at 589 (emphasis added). Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. See id. at 588; State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997). The jury may look at all the evidence and draw whatever reasonable inferences may exist, and this court may not substitute its judgment or inference for those of the jury. Copeland, 677 S.W.2d at 475 (citing Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971)).[4]

Our review of the record reveals that the evidence was sufficient to support the jury's conclusion that Kinzer's testimony identifying the Defendant as one of the perpetrators who committed the aggravated robbery at P&R Market was adequately corroborated. The Defendant's car was tracked by GPS to a location in the vicinity of the robbery; the guns used in the robbery were found in the Defendant's car; shortly after the robbery, the Defendant was found hiding in an apartment that, according to tenant White, no one was supposed to be in; further, proceeds from the robbery and other participants in the robbery were found in that same apartment. Additionally, the surveillance video, albeit brief, corroborates Kinzer's testimony that the Defendant was involved in the robbery: Kinzer testified that the Defendant had a shirt tied around his face, and such was reflected in the video. The law does not require that all parts of an accomplice's testimony be corroborated by independent evidence. Griffis, 964 S.W.2d at 589. Given the foregoing, we conclude that the circumstances established sufficient proof, independent of Kinzer's testimony, for a reasonable jury to find beyond a reasonable doubt that the Defendant participated in the aggravated robbery of the P&R Market. The jury considered all of the evidence and obviously concluded that Kinzer's testimony identifying the Defendant as one of the

---

[4] The trial court correctly instructed the jury that Kinzer was an accomplice as a matter of law.

perpetrators of the P&R Market robbery was sufficiently corroborated, and we will not second-guess their assessment of the evidence on appeal. See Copeland, 677 S.W.2d at 475. Therefore, the Defendant is not entitled to relief on this issue.

## *II. Inadequate Notice of Co-Defendant's Intent to Testify*

The Defendant contends that the trial court erred in allowing Kinzer to testify because the State had provided insufficient notice of Kinzer's intent to testify and such resulted in prejudice to him. The State responds that the trial court properly allowed Kinzer to testify at the Defendant's trial because the State informed the Defendant as soon as it was aware Kinzer would testify; further, the Defendant has failed to prove that he was prejudiced by the State's delay in notice, that the State gained any undue advantage from the late disclosure, or that the State acted in bad faith. We agree with the State.

We review trial court decisions concerning the admissibility of evidence under an abuse of discretion standard. See State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004); State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996). A trial court does not abuse its discretion unless it applies an incorrect legal standard or reaches an illogical decision that causes an injustice to the complaining party. Id.

Tennessee Code Annotated section 40-17-106 requires the State to include in the indictment "the names of the witnesses as [it] intends shall be summoned in the cause." However, the statute "is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992) (citing State v. Street, 768 S.W.2d 703, 710-11 (Tenn. Crim. App. 1988)). Rather, the purpose of the statute is to furnish the names of potential witnesses in order to prevent surprise for the defense at trial. See State v. Dane Sayles, No. E2012-00138-CCA-R3-CD, 2013 WL 1870058, at *17 (Tenn. Crim. App. 2013) (citing State v. Melson, 638 S.W.2d 342, 364 (Tenn. 1982)). To obtain relief, a defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing the witnesses' names. Harris, 839 S.W.2d at 69 (citing State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Craft, 743 S.W.2d 203 (Tenn. Crim. App. 1987)). However, the decision of whether to allow a witness to testify is left to the sound discretion of the trial judge. Kendricks, 947 S.W.2d at 883. "Moreover, prejudice to the defendant must result from the lack of notice [and] not the prejudice which resulted from the witness's testimony." Id. Further, Rule 16 of the Tennessee Rules of Criminal Procedure "does not require nor authorize pretrial discovery of the names and addresses of State's witnesses." State v. Martin, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982).

As noted by the State, neither during the jury-out hearing nor in his brief does the

Defendant demonstrate that he was prejudiced by the late disclosure of Kinzer's intent to testify, that the State gained an undue advantage, or that it acted in bad faith. In fact, the Defendant has never asserted that the State received an undue advantage or acted in bad faith.[5] On the issue of prejudice, at the hearing, the Defendant simply stated that the lack of notice prevented him from doing an investigation on "these matters," presumably Kinzer's testimony. In his brief, he expounds on that allegation, stating that

> The lack of sufficient notice was very prejudicial to the [D]efendant. Information, when requested through discovery, is very crucial in that the [D]efendant can make informed decisions about the future course of conduct of the case—that is, whether to engage in plea bargaining, whether to move to suppress certain evidence or whether to proceed to trial.

After viewing the record and the applicable authorities, we conclude that the trial court did not abuse its discretion by allowing Kinzer to testify. At the hearing, the sole relief requested by the Defendant regarding this late notice was the exclusion of Kinzer's testimony. As previously noted, the purpose of the notice requirement is to prevent the Defendant from being surprised at trial, and the record shows that the Defendant knew that Kinzer would testify two days prior to trial but never requested that the trial be reset. This would have provided him an opportunity to "investigate matters," file any pertinent motions, and discuss plea agreements with the State, all the reasons proffered in his brief as evidence of his being prejudiced by the late disclosure. Because any of these alleged harms could have been remedied by the Defendant's requesting that the trial date be reset, and he failed to request such, the Defendant has failed to show that he was prejudiced by learning of Kinzer's intent to testify just two days prior to trial. He is not entitled to relief on this issue.

### III. Maximum Sentence Excessive

The Defendant contends the trial court's imposition of the maximum sentence was excessive because the Defendant's record contained mostly petty juvenile offenses and such was insufficient to increase the sentence to twelve years. The State responds that the trial court's sentence was not excessive given the many violent and property-related offenses in the Defendant's juvenile record to which he pleaded guilty.

---

[5] We note that, in his brief, the Defendant – pointing to Kinzer's testimony that he decided to testify one to two months prior to trial and communicated the same to his attorney – seems to suggest that the State was being untruthful about when it became aware of Kinzer's intention to testify; this is generally indicative of a bad faith argument. However, the Defendant only argued prejudice at trial and in his brief; thus, we will not construe his argument in any other way. Nonetheless, we also note that the Defendant has not provided this court with any evidence that the State knew of Kinzer's intent a month prior to its' informing the Defendant of such.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute. . . ." Bise, 380 S.W.3d at 706. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In the instant case, the trial court applied the following enhancement factors: factor 8, that the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and factor 16, that the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114(8), (16). The trial court noted that no mitigating factors were applicable, and the Defendant requested none. The record supports the trial court's application of the enhancement factors, and those factors alone are sufficient to justify the trial court's imposition of the maximum sentence. The

Defendant's presentence report showed multiple offenses involving violence and property-related crimes, as well as the juvenile court equivalent to violations of probation. Furthermore, it was within the trial court's discretion to sentence the Defendant anywhere within the eight to twelve-year range. Therefore, we conclude that because the trial court considered the principles of sentencing and gave detailed reasons supporting its imposition of the maximum sentence, including why it was applying certain enhancement factors, its within-range sentence was proper. Therefore, the Defendant is not entitled to relief on this issue.

CONCLUSION

Based on our review of the record and the applicable law, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE